# UNITED STATES DISTRICT COURT
## DISTRICT OF THE VIRGIN ISLANDS
## ST. CROIX DIVISION

**CHAMBERS OF**
**ANNE E. THOMPSON**
**JUDGE**

**U.S. COURTHOUSE**
**402 E. STATE STREET**
**ROOM 4000**
**TRENTON, NJ 08608**
**(609) 989-2123**

To:   All parties and counsel
Re:   **Casandra Paul v. Hovensa LLC, 07-cv-00051**

April 4, 2013

Dear Counsel,

Upon further review of the record, and in light of the answers provided by counsel during the telephone conference of Wednesday, March 27, 2013, the Court has decided that further oral argument with regards to the pending motion for summary judgment is unnecessary. Enclosed please find the Order and Opinion being issued in this case.

Very truly yours,

ANNE E. THOMPSON, U.S.D.J.

Cc: All parties and counsel

NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF THE VIRGIN ISLANDS**
**ST. CROIX DIVISION**

Casandra PAUL,

                Plaintiff,

v.

HOVENSA L.L.C.,

                Defendant.

Civ. No. 1:07-cv-00051-AET-GWC

ORDER

THOMPSON, U.S.D.J.

      In accordance with the Opinion issued herewith,

      It is on this _____ day of April, 2013

      ORDERED that Defendant's Motion for Summary Judgment, [Doc. Nos. 473-74], is

GRANTED with respect to all claims brought under Title VII of the Civil Rights Act of 1967, 42

U.S.C.A. §§ 2000e, *et seq*.; the Virgin Islands Civil Rights Act, 10 V.I. § 64; Title I of the

Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq*.; the Virgin Islands Wrongful

Discharge Act, 24 V.I. § 76, *et seq*.; as well as all claims asserting Retaliation, Intentional

Infliction of Emotional Distress, Breach of the Implied Duty of Good Faith and Fair Dealing, and

Punitive Damages; and it is

      ORDERED that Plaintiff's Motion for Sanctions under 28 U.S.C. § 1927, [Doc. No. 412],

is DENIED; and it is

      ORDERED that all other pending motions are DISMISSED as MOOT; and it is

1

ORDERED that this case is CLOSED.

_____
ANNE E. THOMPSON, U.S.D.J.

NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF THE VIRGIN ISLANDS**
**ST. CROIX DIVISION**

Casandra PAUL,

                Plaintiff,

v.

HOVENSA L.L.C.,

                Defendant.

Civ. No. 1:07-cv-00051-AET-GWC

OPINION

THOMPSON, U.S.D.J.

This matter has come before the Court on Defendant Hovensa L.L.C.'s ("Defendant's") Motion for Summary Judgment, [Doc. Nos. 373-74], and Plaintiff Casandra Paul's ("Plaintiff's") Motion for Sanctions under 28 U.S.C. § 1927, [Doc. No. 412]. Both motions are opposed. [Doc. Nos. 408-09, 422]. The Court has decided the motions based upon the submissions of the parties and without oral argument, pursuant to Federal Rule of Civil Procedure 78(b). For the reasons stated herein, Defendant's motion for summary judgment is granted and Plaintiff's motion for sanctions is denied.

BACKGROUND

The present action arises from Plaintiff's claims of discrimination on the basis of sex, disability, and race in violation of Title VII of the Civil Rights Act of 1967, ("Title VII"), 42 U.S.C.A. §§ 2000e, *et seq.*; the Virgin Islands Civil Rights Act, ("VICRA"), 10 V.I. § 64; and Title I of the Americans with Disabilities Act, (the "ADA"), 42 U.S.C. §§ 12101, *et seq.* [Doc. No. 120-1, "Third Amd. Compl."]. Plaintiff further alleges violations of the Virgin Islands

Wrongful Discharge Act ("WDA"), and asserts claims of retaliation, the intentional infliction of emotional distress, breach of the implied duty of good faith and fair dealing, and punitive damages. [Doc. No. 120-1, Third Amd. Compl.].

Defendant, an oil refinery located in the U.S. Virgin Islands, St. Croix, hired Plaintiff, a black female, in 1988 as a Terminal Dispatcher. [Doc. No. 374, Def.'s Statement of Undisputed Mat. Facts[1], "SUMF," at ¶¶ 1-2; Doc. No. 120-1, Third Amd. Compl., at ¶ 2]. In October 1992, Plaintiff was promoted to Dock Foreman where she supervised the dock attendants and ship tie-up crew. [SUMF at ¶¶ 1, 9-10]. In May 1994, Plaintiff became an Oil Movement Coordinator ("OMC"), a position she held until her termination in November 2010. [SUMF at ¶¶ 11-12]. An OMC monitors and coordinates oil movement from tank to tank, ship to tank, tank to ship, tank to unit, and unit to tank. [SUMF at ¶ 21]. From July 2000 until her termination, Plaintiff's immediate supervisors were, in the following order, Michael Low, Chukwuka ("Chuck") Amalu, and Rollin Allahar. [SUMF at ¶ 13].

I.    Multiple Sclerosis Diagnosis and Initial Requests for Accommodation

In March 2000, Plaintiff was diagnosed with multiple sclerosis. [SUMF at ¶ 69]. As a result, Plaintiff had difficulty walking without the aid of a cane, and had dexterity issues with her hands such that writing was difficult. [SUMF at ¶¶ 70-71]. The parties agree that despite these issues, Plaintiff's condition did not affect her ability to work or perform the duties and responsibilities of an OMC, or prohibit her from complying with any of Defendant's policies and procedures. [SUMF at ¶ 72].

---

[1] Simple citations to Defendant's Statement of Undisputed Material Facts refer to those facts undisputed by Plaintiff. Where there is some apparent dispute but the citation is still to Defendant's Statement of Undisputed Material Facts, the Court has attempted to distill and include here that version of events that falls along the points of agreements between the parties. Otherwise, statements are Court findings of fact from an independent review of the evidence.

After her diagnosis, Plaintiff requested several accommodations to help her with the above-mentioned mobility issues. [SUMF at ¶ 155]. One such accommodation involved the installation of a ramp for her workspace in the computer room (also referred to in the papers as "the control room"). [SUMF at ¶¶ 201; 221; Doc. No. 371, Willie-Paul Aff., Ex. A; Doc. No. 342, Amalu Dep., 86:11-13]. Plaintiff requested the ramp at some point in 2003 and was told that one would be installed after the Christmas holiday. [SUMF at ¶¶ 201; Doc. No. 408, "Pl's Resp. to SUMF," at ¶ 201]. After an incident in which Plaintiff tripped in January 2004, Defendant installed the ramp. [SUMF at ¶ 201].

Plaintiff also sought an evolving list of accommodations with regards to transportation across Defendant's property, in order to minimize the exertion required to reach her workstation each day. To start, Plaintiff requested an access pass through an administrative building so that she would no longer have to walk around it. [SUMF at ¶ 158; Pl.'s Resp. to SUMF at ¶ 158]. Plaintiff alleges that she requested a pass to access the building from her supervisor, Mr. Low, but that he failed to provide it. [SUMF at ¶ 160]. After writing to Defendant's president, Plaintiff received the pass. [SUMF at ¶¶ 160, 162-63].

From the administration building, Plaintiff was then to take a shuttle to her workstation. [SUMF at ¶ 164]. There is some dispute among the parties as to the effectiveness of this accommodation. Plaintiff alleges this arrangement resulted in long periods of waiting in the hot sun, and that on one such occasion she passed out. [SUMF at ¶ 166]. While Defendant asserts that no one told Plaintiff to wait outside, Plaintiff contends that waiting inside the administration building was infeasible as her reduced mobility made reaching the shuttle difficult, and missing the shuttle invariably led to a late arrival on shift. [SUMF at ¶¶ 170-71; Pl.'s Resp. to SUMF at ¶¶ 170-71].

On April 4, 2005, Plaintiff raised concerns about her daily wait for the shuttle and proposed that she be permitted to drive her own personal vehicle into the refinery. [SUMF at ¶¶ 172, 174]. Defendant denied her request, as only certain individuals were permitted at that time to drive personal or company vehicles onto the property.[2] [SUMF at ¶¶ 175, 176-77]. Instead, Defendant arranged for a taxi driver to transport Plaintiff. [SUMF at ¶ 178]. While this appears to have worked for a while, at some point the taxi driver refused to drive Plaintiff after an incident with Plaintiff's son.[3] [SUMF at ¶¶ 178, 183-84].

Finally, Defendant arranged for co-workers to drive Plaintiff across company property. [SUMF at ¶ 185]. Plaintiff continues to dispute the convenience and efficacy of this alternative, arguing that co-workers disliked driving her due to possible liability issues and the associated inconvenience. [Pl.'s Resp. to SUMF at ¶¶ 186-87].

II.   <u>Applications for Promotion</u>

On July 27, 2006, Defendant posted an opening for the newly-created position of Supervisor, Oil Movements and Documentation Terminal Department ("Document Supervisor"), to oversee the OMCs and Terminal Dispatchers. [SUMF at ¶¶ 76, 77]. Plaintiff applied for the position after encouragement from her then-supervisor, Chuck Amalu.[4] [SUMF at ¶¶ 78, 81].

---

[2] There is a dispute between Defendant and Plaintiff over whether this was a valid restriction; Defendant cites liability concerns and setting a negative precedent for other employees if Plaintiff were permitted to drive her personal vehicle into the refinery. [SUMF at ¶ 174; Pl.'s Resp. to SUMF, Ex. 21]. Plaintiff notes that various personnel were permitted to drive onto refinery property, implying that it makes little sense that she personally was denied. [Pl.'s Resp. to SUMF at ¶ 174].

[3] Plaintiff asserts that her son became enraged and hit the window of the taxi after the taxi driver made her enter from the rear of the vehicle, forcing Plaintiff to lift her leg higher than it could go given her physical state. [Pl.'s Resp. to SUMF at ¶ 183].

[4] There is some dispute between Defendant and Plaintiff over whether or not Mr. Amalu encouraged all of the OMCs to apply, or simply encouraged Plaintiff to apply. [*Compare* SUMF at ¶ 78 and Doc. No. 342, Amalu Dep. 128:18-25, 129:1, with Pl.'s Resp. to SUMF at ¶ 78]. Plaintiff alleges Mr. Amalu used phrases like "When you become supervisor," thereby implying that he did not encourage all of the OMCs to apply. [Pl.'s Resp. to SUMF at ¶¶ 78-79].

The interviews were conducted by a panel composed of Mr. Amalu, Mike Hailwood, and Robert Williams. [SUMF at ¶ 84]. Each interviewer received a packet that included a copy of Defendant's Equal Opportunity Guidelines. [SUMF at ¶ 85]. As part of the interview process, the interviewers separately scored each of the interviewees and met to discuss their rankings. [SUMF at ¶ 88]. At least one of the interviewers considered the candidates' disciplinary histories and determined that interviewee Rollin Allahar, a male of Indian descent with fewer years at the company than Plaintiff and a somewhat contentious history,[5] [SUMF at ¶¶ 92-93, 98], had fewer reported disciplinary incidents than the other candidates, including Plaintiff, [SUMF at ¶ 104; Pl.'s Resp. to SUMF at ¶ 104]. It is unclear from the record whether Mr. Allahar's comparatively short time at the company (between 5 and 6 years as compared with Plaintiff's 18) was factored into this analysis. Indeed, Plaintiff disputes that this is a legitimate comparison, alleging that Mr. Allahar's fewer years at the company would likely mean he had fewer mistakes in his history. [Pl.'s Resp. to SUMF at ¶ 104].

It is undisputed that the interviewers ranked Mr. Allahar and another applicant, Raphael Garcia, ahead of Plaintiff. [SUMF at ¶¶ 90-91]. It is also undisputed that after discussing their rankings, the interviewers collectively decided to award the position to Mr. Allahar, which decision they announced on October 2, 2006. [SUMF at ¶¶ 92-93, 98]. Defendant attributes Mr. Allahar's selection to his good work ethic, strong performance as an OMC, and excellent interpersonal skills.[6] [SUMF at ¶ 98]. The interviewers took special note of a plan he presented during his interview in which he outlined departmental changes he would make if he were

_____

[5] In 2008, Mr. Allahar was found not-guilty for the alleged 2005 rape of an acquaintance in her home. [Doc. No. 420, Ex. 1]. At the time of the interview for the Document Supervisor position, Mr. Allahar still had not been acquitted of the charges, and, according to Plaintiff, had to follow certain restrictions concerning contact with an eyewitness who was also an employee of Defendant. [Pl.'s Resp. to SUMF at ¶ 104].
[6] For example, one of the interviewers testified that Mr. Allahar was known "to be a really hard worker, very personable guy." [Doc. No. 347, Hailwood Dep. at 88:11-13, 17-18].

awarded the Document Supervisor position.  In particular, he presented a proposal to cross-train employees as both OMCs and Terminal Dispatchers in order to improve shift coverage.  [SUMF at ¶ 100].

Plaintiff's August 31, 2006 interview also received positive feedback from interviewers. [Pl.'s Resp. to SUMF, Ex. 10].  Positive comments in the interview notes described Plaintiff as a top OMC whose work record supported a dedication to her job, and stated that Plaintiff was "constantly suggest[ing] ways to improve the performance of the OMCs."  [Pl.'s Resp. to SUMF, Ex. 10].  No comments were made during the interview in relation to Plaintiff's sex or disability. [SUMF at ¶¶ 87-88].  While Plaintiff does not appear to have presented a plan comparable to that of Mr. Allahar *during* her interview, she contends that on a prior occasion, she brought forward a plan to improve the department by reducing tank contamination.[7]  [Doc. No. 359, Pl.'s Dep. I at 44:4-21].  Regardless, Plaintiff was ultimately not selected for the position of Document Supervisor based upon "previous work history."  [Doc. No. 363, Ex. 30].

After receiving notice of Mr. Allahar's selection, Plaintiff in October 2006 told Robert Williams she felt Defendant discriminated against her by failing to award her the promotion.[8] [SUMF at ¶ 149].  Mr. Williams alerted Richard Mahurt, Director of Human Resources, to Plaintiff's internal complaint, and Plaintiff was told her claims would be promptly investigated. [SUMF at ¶ 150].

Andy Mehalko, an employee of a third party company hired to investigate Plaintiff's claims, conducted interviews with Plaintiff, Mr. Hailwood, Mr. Amalu and Mr. Williams. [SUMF at ¶¶ 151-52].  At one point in his notes from an interview he conducted with Mr.

---

[7] The Court currently finds the evidence of why Plaintiff's plan was never implemented too uncertain to reach a final conclusion as to the plan's validity.

[8] Plaintiff testified she did not believe Defendant's failure to promote her to the Document Supervisor position had anything to do with her race, but that Defendant discriminated against her based upon her sex and disability.  [SUMF at ¶¶ 109-10].

Williams, Mr. Mehalko wrote under the heading "Shift/Night work?" the following: "OMC call in sick – don't like calling in female shift worker.  If have choice-goes to male.  Safety issue-drive on island.  Woman ever come in @ night?  Yes, all the time."  [Pl.'s Resp. to SUMF, Ex. 11].[9]  Mr. Mehalko ultimately concluded there was no evidence that Plaintiff was denied the Document Supervisor position based upon her disability.  [SUMF at ¶ 153].

Plaintiff contests Mr. Mehalko's conclusion, citing a comment made by panel interviewer Mr. Hailwood during his deposition.  In response to the question of whether he felt Plaintiff was physically unable to perform any of the duties and responsibilities of the Document Supervisor position, Mr. Hailwood stated: "To be honest, it did come into my mind . . . . she might have been restricted, because there's quite a bit of movement to and fro, you know, within the terminal."[10]  [Pl.'s Resp. to SUMF at ¶ 89].  Plaintiff further asserts evidence of sex discrimination based upon (1) Mr. Mehalko's interview notes and (2) the fact that, traditionally, there have been very few female supervisors.  [Pl.'s Resp. to SUMF at ¶ 111].

On September 29, 2006, Defendant posted an opening for the position of Superintendent, Oil Movements and Documentation Terminal Department ("Document Superintendent").  [SUMF at ¶ 115].  Plaintiff applied for the position but did not receive an interview.  [SUMF at ¶¶ 123, 125].  Defendant selected Kyle Lee, a white male, as the new Document Superintendent.  [SUMF at ¶ 131].  Mr. Lee had a 20-year career in the petroleum industry, during which time he served as corporate auditor, regional trainer, branch manager, operations coordinator, operations manager, field supervisor and inspector.  [SUMF at ¶ 133].

---

[9] Defendant points out that there is no deposition testimony explaining the meaning of the interview notes, assumedly undermining their utility.  [Doc. No. 420, Def.'s Reply to Pl's Resp. to SUMF at ¶ 89].

[10] Despite this, Plaintiff testified elsewhere that she did not believe Mr. Hailwood discriminated against her.  [SUMF at ¶ 113; Pl.'s Dep. I 121:14-16].

III.     Initial Filing of the EEOC Charge and the Complaint in Federal Court

In February 2007,[11] Plaintiff filed an administrative charge with the Equal Employment

Opportunity Commission ("EEOC"), alleging that Defendant (1) discriminated against her on the

basis of her race, national origin, sex, and disability by not selecting her for the position of

Document Supervisor; and (2) denied her a series of reasonable accommodations by delaying to

build a ramp into the computer room and issue her a pass to walk through the administration

building, and by forcing her to sit in the sun while she waited for the shuttle to cross company

property.  [SUMF at ¶ 221].

In her charge, Plaintiff also included details of older incidents, including (1) a 1994

statement from Human Resources Supervisor Chris Laginni to the effect that she would have to

go on Long-Term Disability after her involvement in a car accident, as there was no work for

Plaintiff at the refinery; and (2) her efforts in the early 2000s to fill in for, or "act up" as, her

Supervisor Chuck Amalu during his absences from work.  [Doc. No. 371, Aff. Willie-Paul, Ex.

A, ¶¶ 6-10].[12]

---

[11] The Court notes that in the materials submitted by both parties for summary judgment, the
filing date for Plaintiff's EEOC charge is listed as June 2007.  [SUMF at ¶ 221; Pl.'s Opp. To.
Sum. Judgmt. at 16].  In previous submissions, the parties had referred to the date of filing as
February 9, 2007.  [See, e.g., Doc. No. 87, Def.'s Opp. To Pl.'s Motion to Amd. the First Amd.
Compl. at 2; Doc. No. 91, Pl.'s Reply to Def.'s Opp. at 3].  Upon close scrutiny of the
documents, the Court concludes that the initial date proffered by the parties, February 9, is likely
correct.  The June 25, 2007 timestamp upon which the parties apparently rely for the
establishment of the June 2007 date appears not on the face of the EEOC complaint, but upon
Defendant's *notice* from the EEOC that Plaintiff had filed a charge.  [Doc. No. 371, Aff. Willie-
Paul, Ex. A].  The only date that appears on the actual EEOC charge as provided to the Court is
February 9, 2007.  [*Id.*].  Thus, for the purposes of this analysis, the Court will rely upon the
earlier date.
[12] Additionally, Plaintiff includes in her EEOC charge details of being called in twice to work
nights during Christmas holidays to fill in for Dwight Hoffman (a white male) so that he could
stay home with his family, and for Bob Crosby when he had fish poisoning.  [Doc. No. 371, Aff.
Willie-Paul, Ex. A].

As concerns Chris Laginni's statement, Plaintiff explains in her narrative that after some confusion and further communications with Defendant, she was permitted to return to work after Mr. Laginni received more information regarding her work history.  [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶ 6].  As concerns "acting up" in place of her supervisor, Plaintiff describes how during a certain period, employees of her same level and position were selected to fill in for Mr. Amalu during his absences.  [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10].  Plaintiff, however, was not.[13]  [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10].  Upon inquiring as to why she was never chosen to act up, Mr. Amalu and Ralph Lodrizgesa (Mr. Amalu's manager) allegedly informed her that she was not selected because of her disability and because she would have to work nights.[14]  [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10].  After reporting the problem to Human Resources, however, Plaintiff was subsequently allowed to act up.  [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶ 10].

On May 7, 2007, Plaintiff filed a lawsuit in federal court alleging: (1) violation of Title VII; (2) violation of VICRA; (3) wrongful discharge; (4) intentional and negligent infliction of emotional distress; (5) violation of good faith and fair dealing; and (6) punitive damages.  [Doc. Nos. 1, 11-1, First Amd. Compl. (markup)].  The enumerated counts were based upon substantially the same facts as those recounted in Plaintiff's EEOC charge.  Plaintiff failed to make a specific reference to the ADA, but she included language to the effect that she had "been discriminated against as a result of her disability, sex, and race in her job assignments,

---

[13] In her EEOC charge, Plaintiff names Raphael Garcia as one of those chosen.  [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10; *see also*, Garcia Resume, Doc. No. 362, Ex. 5G].  Mr. Amalu also remembers choosing Mr. Allahar as one of his first temporary replacements.  [Doc. No. 342, Amalu Dep. at 75:7-8].

[14] Plaintiff had allegedly requested not to work nights if possible, even though she did sometimes work nights as part of her regular position.  [Doc. No. 342, Amalu Dep. at 78:18-24, 79:1].

promotions, pay, benefits, evaluations, and treatment." [Doc. No. 11-1, First Amd. Compl. (markup), at ¶ 46].

On August 29, 2008, the EEOC issued a finding of no probable cause and advised Plaintiff of her right to sue. [SUMF at ¶ 222]. This Dismissal and Notice of Rights required Plaintiff to file a Title VII, ADA and/or Age Discrimination lawsuit based on the facts alleged in her initial charge within 90 days, or lose the right to sue under those statutes. [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶ 10].

IV. Events Following the Filing of the Complaint and the EEOC Charge

    a. General Accommodations/Efforts

Defendant notes that, among other accommodations provided to Plaintiff in mid-2007, it provided Plaintiff with a scooter in or around July 2007 after a fall in the computer room. [SUMF at ¶¶ 188-89]. Moreover, since it was difficult to navigate the scooter through the lunchroom, Defendant provided Plaintiff with a microwave and refrigerator in the computer room at her request. [SUMF at ¶¶ 192-93].

    b. Installation of an Automatic Bathroom Door

On July 25, 2007, Plaintiff spoke to management about putting an automatic door on the first floor bathroom in the terminal building. [SUMF at ¶ 195]. Defendant had already remodeled the first floor bathroom to make it handicap accessible.[15] Plaintiff offers to the Court an email in which Mr. Amalu refers to Plaintiff's request as "an ADA issue" that preferably would be "handled as an emergency." [Pl.'s Resp. to SUMF, Ex. 22]. For nine months, until Plaintiff's placement on administrative leave in mid-2008, Defendant failed to install an

---

[15] Defendant asserts the first floor bathroom was remodeled at Plaintiff's request and as an accommodation to Plaintiff. [SUMF at ¶ 194]. Plaintiff, on the other hand, points to testimony by Mr. Amalu, [Doc. No. 342, Amalu Dep., 121-24], indicating that Defendant remodeled the bathroom in response to the safety department's determination that it was not ADA compliant.

automatic door.  [SUMF at ¶¶ 195, 198-99].  The door was installed nearly two years later, in July 2009, upon Plaintiff's return.  [SUMF at ¶ 199].

      c.  <u>Honeywell Software System</u>

In October 2007, Plaintiff expressed to Human Resources that she was having difficulty using the navigation ball on the Honeywell software system, a new, soon-to-be implemented computer system.  [SUMF at ¶ 205].  Plaintiff requested that a mouse be installed, but the Engineering Applications Department declined, citing an inability to install a USB port in the system.  [SUMF at ¶¶ 206-07].  Plaintiff admits that the Engineering Applications Department eventually resolved the issue another way, and, at any rate, the system was ultimately never implemented.  [SUMF at ¶ 208].

As an additional matter, training for the Honeywell system involved sending certain employees to Canada for training.  [SUMF at ¶ 114].  Plaintiff suspects she was not selected for the trip based upon her disability.  [Pl.'s Resp. to SUMF at ¶ 114].  Although no one specifically said anything to Plaintiff to confirm that theory, Plaintiff asserts that she was an otherwise logical choice for the trip given her additional years of experience over the OMC selected to attend (Mr. Allahar), and her previous experience training other OMCs in the terminal.  [Doc. No. 360, Pl.'s Dep. II. 108-110].

      d.  <u>The May 28, 2008 Incident and Subsequent Administrative Leave</u>

On May 28, 2008, Plaintiff fainted and/or lost consciousness, ultimately leading to her placement on administrative leave until July 2009.  [*See generally*, SUMF at ¶¶ 224, *et seq.*].  On the day of the incident (hereinafter, the "May 28 Incident"), Plaintiff was scheduled to work the 4:00 PM to 12:00 AM shift.  [SUMF at ¶ 224].  Plaintiff testified she felt sick prior to reporting to work (her legs were tired and she felt hot) and that she was stressed from family-related

issues. [SUMF at ¶¶ 225-26; Pl.'s Resp. to SUMF at ¶¶ 225-26]. When Plaintiff arrived at work, she told her supervisor, Mr. Allahar, she was not feeling well. [SUMF at ¶ 229]. At that point Mr. Allahar gave her the opportunity to go home or to stay in the computer room while another OMC took over her duties. [SUMF at ¶¶ 229-30]. Plaintiff declined both offers, insisting she felt better and wanted to work. [SUMF at ¶¶ 229-30]. Mr. Allahar monitored Plaintiff's performance and, after observing Plaintiff make several judgment calls without any errors, allowed Plaintiff to continue monitoring the control board. [SUMF at ¶ 231].

At some point during Plaintiff's shift, she lost consciousness and/or fainted. [SUMF at ¶ 235; Pl.'s Resp. to SUMF at ¶ 235]. While Plaintiff was unconscious, one of the tanks filled to above the High-High set point, setting off the corresponding warning alarm indicating the tank would overflow absent immediate action. [SUMF at ¶ 236]. Plaintiff did not hear the Hard High-High alarm going off until roused by Terminal Dispatcher Billy Kalloo, who came to investigate after hearing the alarm. [SUMF at ¶¶ 237-40]. Plaintiff then contacted Terminal Operator Thomas Hutchinson, with whom she had communicated for the 20- and 10- minute warnings, and advised him to switch tanks immediately. [SUMF at ¶¶ 241, 244]. Defendant's subsequent investigation determined the tank nearly overflowed due to Plaintiff's unresponsiveness, [SUMF at ¶¶ 246, 248], a conclusion Plaintiff disputes insofar as other employees may have contributed to the delay in switching the tanks and failed to step in promptly when action was needed, [Pl.'s Resp. to SUMF at ¶¶ 243, 248].

Following the May 28 Incident, Plaintiff was placed on paid administrative leave and her return was made conditional upon her doctor's clearance that she could perform her duties as an OMC. [SUMF at ¶ 254]. Plaintiff subsequently secured a letter from her long-time treating physician that she could return to work on June 23, 2008. [SUMF at ¶¶ 257-61]. Defendant,

however, sent a letter on September 16, 2008 to Plaintiff's attorney requesting a more comprehensive opinion from Plaintiff's physician, as the physician's letter failed to clarify whether he had knowledge of Plaintiff's duties as an OMC or was familiar with the details of the May 28 Incident.  [SUMF at ¶¶ 258-67].

In response, Plaintiff's attorney sent a reply letter prohibiting Defendant from directly contacting Plaintiff's physician.  [SUMF at ¶ 268].  The letter also requested documentation describing the essential functions of the OMC position, and advised that Plaintiff intended to obtain an opinion from a neurologist, Dr. Weisher, [SUMF at ¶ 268], which she did later that same month, [SUMF at ¶ 272].

Defendant, by way of response on September 25, 2008, specified that it did not want an opinion from Dr. Weisher, but wanted an opinion from Plaintiff's initial treating physician. [SUMF at ¶ 269].  Defendant subsequently rejected as inadequate an October 2, 2008 written statement from Dr. Weisher, in which Dr. Weisher indicated that there was no apparent reason for Plaintiff's loss of consciousness and/or fainting spell, but that an electroencephalogram (EEG) could be conducted to definitively rule out epilepsy.  [SUMF at ¶¶ 277-81].  Again, Defendant requested more proof that Dr. Weisher knew the duties and risks associated with Plaintiff's position and understood the events of May 28.  [SUMF at ¶¶ 279-88].

For the next few months, Plaintiff and Defendant exchanged various communications over what doctor should answer what questions, under what time frame, and what information should be and was provided to which doctor and by whom.  [SUMF at ¶¶ 278-349].  Defendant provided a letter for Plaintiff to give to her treating physician with attachments containing an extremely detailed questionnaire and work practices summary.  [SUMF at ¶¶ 285-86].  There is some dispute over whether the key work practices summary was overly inclusive with respect to

the demands and requirements of the OMC position, [SUMF at ¶ 292; Pl.'s Resp. to SUMF at ¶ 292], as well as some confusion and dispute over whether the letter and attachments were even delivered to her treating physician, [SUMF at ¶¶ 293-95; Pl.'s Resp. to SUMF at ¶¶ 293-96]. Plaintiff requested to return to work in November, but Defendant refused to allow such return without the treating physician's attention to Defendant's questionnaire. [SUMF at ¶¶ 300-01].

Plaintiff's treating physician ultimately refused to communicate further with the parties regarding Defendant's remaining concerns, [*id.* at ¶¶ 296-304], despite previous assurances that he would do so, [SUMF at ¶¶ 297-98]. As a result, Defendant in January 2008 requested that Dr. Weisher respond to its fitness for duty questionnaire by the end of the month. [SUMR at ¶ 311]. When there was no response from Dr. Weisher, Defendant extended the deadline to February 18, 2009 and offered to pay any associated fee with the evaluation. [SUMF at ¶¶ 313-14, 319]. Resolution of the matter was further delayed, however, when Defendant received notice that Plaintiff's attorney would not deliver the questionnaire to Dr. Weisher until completion of a March 16 trial. [SUMF at ¶ 321].

After further communications between the parties over the course of April and May 2009, Dr. Weisher provided documentation on Plaintiff's condition satisfactory to Defendant, [SUMF at ¶¶ 339-48], and Defendant paid for Plaintiff to undergo an EEG. [SUMF at ¶¶ 305-51]. Plaintiff notified Defendant on June 22, 2009 that her EEG results were normal, and Defendant approved a July return date for Plaintiff the next day. [SUMF at ¶¶ 351, 353, 357-58].

For the majority of the period that Plaintiff was on leave, she received full pay and benefits. [SUMF at ¶ 323]. However, on March 23, 2009 Defendant notified Plaintiff that it was changing Plaintiff's leave status from paid to unpaid due to her continued delay in providing the medical information required for her return to work. [SUMF at ¶ 324]. Unfortunately, due to an

14

inadvertent clerical error, Plaintiff continued to receive pay for several weeks. [SUMF at ¶¶ 328-29]. There then followed some confusion in recouping the pay from Plaintiff's checking account, as Plaintiff's account held insufficient funds for such recoupment, and Defendant's attempts to do so allegedly resulted in a penalty fee for Plaintiff. [SUMF at ¶¶ 330-32]. After her reinstatement, Defendant changed Plaintiff's status from unpaid to paid and retroactively converted the portion of her leave that was unpaid to paid. [SUMF at ¶ 354].

     e.   <u>The September 3, 2010 Incident and Plaintiff's Placement on CAPs</u>

At some point after her return to work, Plaintiff was placed on new medication that both failed to alleviate certain symptoms of her Multiple Sclerosis and induced depression. [SUMF at ¶ 372]. Despite this depression, Plaintiff felt she could be sufficiently attentive, responsive, and focused to perform the duties of an OMC. [SUMF at ¶ 373].

On September 3, 2010, Plaintiff was scheduled to work the 8:00 PM to 8:00 AM shift. [SUMF at ¶ 375]. Plaintiff's stomach was not feeling well, she was depressed as a result of her new medication, and she was upset because of events following the recent arrest of her son. [SUMF at ¶ 377; Pl.'s Resp. to SUMF at ¶ 377]. Plaintiff cited Defendant's limited personnel resources as a reason for not calling in sick. [Pl.'s Resp. to SUMF at ¶ 378].

At around 12:30 AM it became apparent, either through observation or through Plaintiff's own comments, that Plaintiff was not feeling well. [SUMF at ¶¶ 380-96]. She allegedly told Terminal Shift Superintendent Reginald Sam that she wanted to go home, and eventually, someone arrived to relieve her of her shift. [SUMF at ¶ 374; Pl.'s Resp. to SUMF at ¶¶ 374].

It was discovered that there were at least some missed stops and a product imbalance that took place during the time Plaintiff was on shift that night. [SUMF at ¶¶ 397-404]. After an investigation, during which Plaintiff gave her version of events, [Doc. No. 360, Pl.'s Dep. II, Ex.

61], Defendant concluded Plaintiff had failed to notify supervision that she was not feeling well, and had committed a series of errors, [SUMF at ¶¶ 403-04].[16]

As a result of the "September 3 Incident", Plaintiff was placed on Defendant's Corrective Action Plan ("CAPs") on October 15, 2010. [SUMF at ¶¶ 68, 412]. Defendant had allegedly reviewed the disciplinary records of OMC Emilinda Pierre, who had also been placed on CAPs previously, to gauge consistency of treatment. [Doc. No. 358, Willie-Paul Dep. II, 107:1-25]. Plaintiff was advised that her performance would be "monitored frequently to verify accuracy of Transfer Tasks, Alarm Conditions, Transfer Sheets, Routing Reports and other required work products." [SUMF at ¶ 414]. In addition, Plaintiff was warned that "[f]ailure to make significant progress at any time during this period . . . may result in further disciplinary action up to and including termination." [SUMF at ¶ 414].

The September 3 Incident was not the first time Plaintiff had been disciplined or placed on CAPs. Her most recent disciplinary history, as provided by Defendant, began on October 26, 1998, when Plaintiff was issued a written warning for missing a stop. [SUMF at ¶ 214]. On December 7, 2001, Plaintiff received a five-day suspension in relation to a November 30, 2001 tank overflow. [Doc. No. 360, Pl.'s Dep. II, Ex. 61]. On November 18, 2002, Plaintiff was issued a written warning for poor performance/inattentiveness to duty relating to her failure to detect that a tank was receiving ballast water for four hours with no level change, which could have resulted in a tank overflow. [SUMF at ¶ 216]. On April 30, 2004, Plaintiff failed to observe the movement of a tank in a timely manner, resulting in a missed stop. [SUMF at ¶ 217].

---

[16] There is some disagreement between Defendant and Plaintiff over the level of Plaintiff's culpability in comparison with others who played a role in the mistakes, both before and after Plaintiff's shift, and if the discipline imposed on the other employees was adequate or comparable to Plaintiff's. [*See* Pl.'s Resp. to SUMF at ¶ 405; Def.'s Reply to Pl.'s Resp. to SUMF at ¶ 405].

On February 11, 2005, Plaintiff was issued a verbal warning for inaccurately opening a gauge. [SUMF at ¶ 218]. On June 19, 2005, Plaintiff was issued a written warning and a five-day suspension for missing a stop, which resulted in the Hard High level alarm going off. [SUMF at ¶ 219]. On February 9, 2006, Plaintiff allegedly missed a stop, causing the High-High alarm to go off, but does not recall if she was disciplined as a result of this mistake. [SUMF at ¶ 220].

On November 17, 2009, Plaintiff failed to monitor a stop and received a warning in her 2009 performance review. [SUMF at ¶ 367]. On March 2, 2010, a tank overfilled and the high level hardware alarm went off. [SUMF at ¶ 369]. Plaintiff received verbal counseling with respect to her role in the incident but was not formally disciplined. [SUMF at ¶ 370-71].

### f.   The October 18, 2010 Incident and Plaintiff's Termination

On October 18, 2010, just three days after being notified that she had been placed on CAPs, Plaintiff was involved in another incident, (the "October 18 Incident"), in which she was ill during her scheduled 12-hour shift. [SUMF at ¶¶ 437-63]. The illness this time, however, was different from the previous September episode in that Plaintiff alleges she threw up multiple times. [SUMF at ¶ 440; Pl.'s Resp. to SUMF at ¶ 440]. Plaintiff further alleges that because she felt chastised for leaving work early and being placed on CAPs after the September 3 Incident, she did not feel she should tell anyone that she was feeling unwell. [Pl.'s Resp. to SUMF at ¶¶ 38, 432].

During her shift, several mistakes were made, and Plaintiff was unable to pass on her shift to the next OMC with all of the necessary paperwork complete. [SUMF at ¶¶ 450-57]. Plaintiff asserts at least some of the mistakes attributed to her that night were the result of her

illness and vomiting.  [Pl.'s Resp. to SUMF at ¶ 447].  Plaintiff was suspended after her shift

pending an investigation into the events of that night.  [SUMF at ¶ 464].

Defendant concluded from its investigation that Plaintiff made a number of serious errors

during her shift in violation of Defendant's company procedures and guidelines, [SUMF at ¶

472], and which, according to Defendant, could have resulted in a catastrophic explosion,

[SUMF at 478].  Defendant further concluded that when Plaintiff became ill during her shift, she

had the responsibility to promptly inform management that she was unfit to work, in order to

avoid any potential incidents.  [SUMF at ¶ 437].  As a result of its conclusions, Defendant

terminated Plaintiff's employment effective November 17, 2010, ostensibly based upon

Plaintiff's previous placement on CAPs and the severity of Plaintiff's error.  [SUMF at ¶ 480].

## V.  Relevant Procedural History Since Termination

After an uncontested April 2008 first amendment to the Complaint in which Plaintiff

added details surrounding the Document Superintendent position, the Court granted Plaintiff's

motion to amend the Complaint a second time over Defendant's objections.  [Doc. No. 97].  In

her second amendment, Plaintiff sought to add additional factual allegations related to disability

discrimination (including Defendant's allegedly unlawful request for a fitness for duty evaluation

following the May 28 Incident) and an additional request for relief under the ADA.  [Doc. No.

81].

In its opposition papers, Defendant argued that Plaintiff had lost the right to file an ADA

claim when the 90-day period following the issuance of the EEOC's right to sue notice lapsed,

and that such amendment would be futile and prejudicial insofar as the scope of discovery would

be greatly expanded.  [Doc. No. 87].  Moreover, the new factual allegations were distinct from

and temporally unrelated to the facts pled in the initial Complaint and the EEOC charge.  [*Id.*].

Since Plaintiff failed to file additional charges with the EEOC within 300 days of the new allegations, Defendant argued that Plaintiff had failed to exhaust her remedies with respect to those claims and was therefore barred from adding them to her Complaint. [*Id.*].

The Court rejected Defendant's arguments, finding that, "Plaintiff's [initial] Complaint gave Defendant notice of allegations [of] disability discrimination," [Doc. No. 97 at 2, 6], even without specific reference to the ADA, and thus that "the proposed amendments . . . [neither] surprise[d] nor substantially prejudice[d] Defendant," [*id.* at 8]. The Court then denied Defendant's motion for reconsideration, [Doc. No. 110]. Plaintiff has since filed a Third Amended Complaint that was unopposed by Defendant. [Doc. No. 128]. After extensive fact discovery, Defendant has now moved for summary judgment on all claims. [Doc. Nos. 373-74]. Plaintiff opposes. [Doc. Nos. 408-09].

LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In reaching this determination, the Court must construe all facts and inferences in the light most favorable to the nonmoving party, *Boyle v. Cty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998), which party must come forward with specific facts showing a genuine issue for trial, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted). "A factual dispute is 'genuine' and thus warrants trial 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248-49, 252 (1986)).

# MOTION FOR SUMMARY JUDGMENT

## DISCUSSION

In its motion for summary judgment, Defendant argues for dismissal of Plaintiff's claims based upon (1) expiration of the statute of limitations and/or failure to exhaust administrative remedies and (2) failure to sufficiently establish the remaining claims. The Court will first discuss those claims Defendant argues should be dismissed based upon a lapse of the applicable statute of limitations and the failure to exhaust administrative remedies. The Court will then review any remaining claims.

I.    Expiration of the Statute of Limitations and/or Failure to Exhaust Administrative Remedies

Defendant's arguments concerning expiration of the applicable statute of limitations and the failure to exhaust administrative remedies can be broken down into various categories. With regards to Plaintiff's ADA and Title VII claims, Defendant argues that based upon the content and timing of Plaintiff's EEOC charge, certain claims should be dismissed because they (1) relate to incidents that occurred more than 300 days prior to the filing of the charge; (2) were not brought by Plaintiff in a lawsuit within 90 days after the issuance of the right to sue notice; or (3) were never even alleged in the charge. With regards to Plaintiff's VICRA claims, Defendant alleges that certain claims must be dismissed as untimely under VICRA's two-year statute of limitations. The Court will consider each of these arguments in turn.

a.    Untimely ADA and Title VII Claims

In order to bring an ADA or a Title VII claim, a plaintiff must file a charge of discrimination with the EEOC within 300 days of an alleged incident. *See* 42 U.S.C. § 2000e-5(e)(1); *Commc'ns Workers of America v. New Jersey Dept. of Personnel*, 282 F.3d 213, 216 (3d Cir. 2002); *Nielsen-Allen v. Indus. Maint. Corp.*, 285 F. Supp. 2d 671 (D.V.I. 2002). If after 180

20

days the EEOC has not resolved the charge, it must notify the complainant, generally through the issuance of a right to sue notice. *See Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984). After receiving the notice of a right to sue, Plaintiff has 90 days in which to file a lawsuit on the investigated claims, after which time the ability to bring suit expires. *See Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001) ("The 90-day period for filing a court action after receipt of a right to sue notice is treated as a statute of limitation."); *Figueroa v. Buccaneer Hotel, Inc.*, 188 F.3d 172, 176 (3d Cir. 1999) (holding that plaintiff's failure to file suit within the 90-day time period completely bars her claims).

Plaintiff's June 2007 EEOC charge principally alleged that (1) Defendant discriminated against her on the basis of race, national origin, sex, and disability by failing to promote her to the position of Document Supervisor; and (2) Defendant denied her a series of reasonable accommodations by delaying to build a ramp into the computer room and issue her a pass to walk through the administration building, and by forcing her to sit in the sun while waiting for an on-site shuttle.

Plaintiff's charge also included details of (1) a 1994 statement from Human Resources Supervisor Chris Laginni after Plaintiff was involved in a car accident, to the effect that there was no work for Plaintiff at the refinery and that she would have to go on Long-Term Disability; and (2) her efforts in the early 2000s to fill in for, or "act up" as, her Supervisor Chuck Amalu during his absences from work.

     i.   Title VII and ADA claims prior to 300-day filing limit

For those claims that should be dismissed because they relate to incidents occurring before the 300-day period of time prior to the filing of the EEOC charge, Defendant argues in its moving papers that there should be no recovery for the claims that (1) Chris Laginni

discriminated against Plaintiff on the basis of her race, sex and disability for his 1994 statement; (2) Chuck Amalu, her supervisor, discriminated against her on the basis of her disability by not asking her to "act up" between 2001 and 2004; and (3) Defendant failed to accommodate Plaintiff by installing an interior ramp to the computer room in 2003.  Given that Plaintiff has failed to counter this argument in her briefing papers, and that each of these claims appears to actually fall outside of the 300-day filing limit for the EEOC charge, the Court agrees that these three claims are untimely, and excludes them as a separate basis for relief. [17]

### ii.   ADA Claims Not Brought within 90 days of Right to Sue Notice

With regards to those claims that should be dismissed due to failure to file a lawsuit within 90 days of receiving the EEOC's notice of a right to sue, Defendant asserts that any ADA claims alleged in Plaintiff's EEOC charge are time-barred because Plaintiff did not file a lawsuit on those claims within 90 days.  Indeed, Plaintiff failed to move to amend her Complaint to add an ADA claim until August 24, 2010, [Doc. No. 81], a significant period of time after the EEOC's issuance of her right to sue notice on August 28, 2008.

In response to Plaintiff's contention that the Court already acknowledged and rejected this argument when it permitted Plaintiff's Second Amended Complaint, Defendant contends that such reasoning fails to find purchase where the standard for amendment is significantly lower than that for summary judgment.  Under the former, a judge is counseled to liberally grant leave to amend.  Under the latter, the Court must grant a party's motion for summary judgment if the movant can show "there is no genuine issue as to any material fact and the movant is entitled

---

[17] Plaintiff also included in her EEOC charge and Complaint details of being called in twice to work nights during the 2005 Christmas holidays to fill in for Dwight Hoffman (a white male) so that he could stay home with his family, and for Bob Crosby when he had fish poisoning.  [Doc. No. 371, Aff. Willie-Paul, Ex. A].  While not included by Plaintiff as relevant grounds for relief in recent briefing, the Court in an abundance of caution clarifies that because these events occurred more than 300 days prior to Plaintiff's filing of her EEOC charge, the Court excludes them as time-barred.

to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Although the Court previously may have found that Defendant would not be prejudiced or surprised by the added disability claims, Defendant argues that this in itself does not circumvent the prohibition of those claims based on the expiration of the applicable statute of limitations.

After some consideration, the Court must again reject Defendant's arguments.  While the initial language of both the lawsuit and the EEOC was broad, Plaintiff clearly stated disability discrimination as part of her claim; functionally, then, Plaintiff had an active lawsuit alleging disability discrimination within 90 days of the issuance of the right to sue notice.  Mindful of not construing discrimination law so strictly or so narrowly to exclude legitimate claims for relief, the Court finds that any basis for an ADA claim brought by Plaintiff in the actual EEOC charge, aside from the three claims dismissed in the previous subsection, is not time-barred.

    iii.  <u>Title VII and ADA Claims Never Raised in the EEOC Charge</u>

Finally, Defendant asserts that certain claims should be dismissed because Plaintiff neglected to raise them in an EEOC charge entirely.  These claims include Plaintiff's allegations that Defendant (1) discriminated against Plaintiff on the basis of her race, sex and disability by failing to promote her to the position of Document Superintendent in violation of Title VII and the ADA; (2) unlawfully demanded a fitness for duty evaluation in violation of the ADA; (3) retaliated and discriminated against her based upon race, sex and disability by placing her on CAPs in violation of Title VII and the ADA; and (4) retaliated and discriminated against her on the basis of her race, sex, and disability by terminating her employment in violation of Title VII and the ADA.  The Court notes that Plaintiff's claim for failure to accommodate regarding the installation of the automatic door should also be included in this group.[18]

---

[18] Summarized in the Background section of this Opinion but not included here is Plaintiff's deposition testimony concerning disability accommodation and discrimination with respect to the

Because the time to file a charge based upon the above claims has passed (that is, Plaintiff failed to file an EEOC charge within 300 days of their occurrence), Plaintiff has allegedly failed to exhaust her administrative remedies with respect to those claims and is subsequently barred from pursuing them in the present suit.

For ease of analysis, the Court will divide these claims and the accompanying arguments into two categories. First, the Court will consider those claims not included in the EEOC charge that arose within the 300 days preceding filing of the charge, or that arose during the pendency of the EEOC's investigation. The Court will review whether any of these claims are still viable under a *Hicks* analysis. The Court will then consider those claims that arose *after* the EEOC's notice of a right to sue.

1.  Title VII and ADA Claims that Arose within 300 Days Prior to Plaintiff's EEOC Charge or during the Pendency of the Subsequent EEOC Investigation

The three claims that were not included in Plaintiff's EEOC charge but that arose either within the 300 days preceding the filing of the charge or during the pendency of the investigation are (1) Plaintiff's claim that Defendant discriminated against Plaintiff on the basis of her race, sex and disability by failing to promote her to the position of Document Superintendent in violation of Title VII and the ADA; (2) her claim that Defendant unlawfully demanded a fitness for duty evaluation in violation of the ADA; and (3) her claim for failure to accommodate based upon a delay in providing an automatic door to the restroom.

---

Honeywell computer system. While the Court considered these facts in view of the larger picture of Plaintiff's experience working for Defendant, the Court does not find that Plaintiff has provided enough evidence to support a claim for a failure to accommodate. The Engineering Department ultimately resolved Plaintiff's track ball problem, and Plaintiff presents no evidence that such resolution was untimely. Plaintiff also fails to assert sufficient evidence to support a discrimination claim with respect to the training trip to Canada, as she merely suspects that she was discriminated against when not chosen to go, without further evidence or argument. As Plaintiff fails to defend this issue further in her briefing, the Court dismisses these facts as a basis on which to support claims for failure to accommodate or discrimination based on disability.

In her rebuttal to Defendant's assertions that these claims are both time-barred and administratively unexhausted, Plaintiff principally relies upon *Hicks v. ABT Assoc., Inc.*, 572 F.2d 960 (3d Cir. 1978).  In *Hicks*, the court permitted a plaintiff to proceed on a claim of sex discrimination, despite the fact that his EEOC charge solely alleged race discrimination.  *Id.*  In reaching this conclusion, the court found two possible bases for jurisdiction.  The first basis, and the one on which Defendant relies in its attempts to distinguish *Hicks* from the present case, was premised upon the plaintiff's reasonable attempts to amend his EEOC charge to include sex discrimination, and the improper denial of those attempts.  *Id.* at 964.  The court found that where the EEOC acted improperly the employee should not be penalized.  *Id.* at 964-65. Moreover, the court concluded that an amendment could be brought even if the plaintiff had failed to amend his complaint within the EEOC's 180-day investigatory period, so long as the amendment was sufficiently related to or grew out of the subject matter of the original charge, thus relating back to the original filing date.  *Id.* at 965 (citing 29 C.F.R. § 1601.11(b) (1976)). In other words, the race and sex discrimination claims in *Hicks* were based upon the same underlying facts, and thus, could relate back.  *Hicks*, 572 F.2d at 965.

If *Hicks* had stopped there, the Court would be persuaded by Defendant's argument that *Hicks* in this instance is largely inapposite.  However, the court in *Hicks* went on to flesh out a separate basis for jurisdiction, and it is on this basis that Plaintiff now relies.  The *Hicks* court found that jurisdiction could depend upon "the *scope* of the civil action following a notice of the right to sue from the EEOC."  *Id.* at 965 (emphasis added).  Or, put another way, where "a charge of some sort is filed with the EEOC . . . the scope of the resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination [including new facts which occurred during

the pendency of the proceedings before the Commission].'"  *Id.* at 965-66 (3d Cir. 1978)

(quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976)).  As noted by

the court, "the purpose of the filing requirement is to allow the EEOC to settle a complaint

informally;" it does not then follow that "[i]f the EEOC's investigation is unreasonably narrow

or improperly conducted, the plaintiff should [] be barred from his statutory right to a civil

action."  *Id.*  Plaintiff emphasizes that it is not necessary that the EEOC "actually investigate and

conciliate a charge before a right to sue letter is issued," *Ostapowicz*, 541 F.2d at 399, n. 6

(citation omitted); the EEOC must merely be given the opportunity to investigate.

Upon review of Plaintiff's EEOC charge, the Court notes that as a general matter Plaintiff

checked the appropriate boxes indicating that she had been discriminated against based upon

race, sex, national origin, and disability.  [Doc. No. 371, Aff. Willie-Paul, Ex. A].  Thus, the

EEOC was on notice of the types of discrimination asserted, and could commence its

investigatory and conciliatory functions.

The Court finds that Plaintiff's claims regarding the Document Superintendent position

(which arose in the latter half of 2006) and the delayed installation of the automatic door (which

arose in 2007) are reasonably within the potential scope of the EEOC's investigation.  The denial

of Plaintiff's application for the Document Superintendent position occurred soon after

Plaintiff's application for the Document Supervisor position.  While Defendant is correct that

this alone is insufficient to establish a nexus between the two claims, the Court finds that if the

EEOC had looked into Plaintiff's failure to promote claim, it is likely that this second incident

would have also come to the fore.[19]

_____

[19] There is some question whether this failure to promote claim, even if permissible under *Hicks*,
is time-barred because of the Third Circuit's categorization of a failure to promote as a discrete
act from which the statute of limitations for EEOC filing begins to run.  *See O'Connor v. City of
Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (finding termination, failure to promote, denial of

Similarly, Plaintiff spoke to management about putting an automatic door on the first floor bathroom in the terminal building in July 2007, within the range of the EEOC's minimum investigatory period. Given Plaintiff's specific identification of claims for failure to accommodate within the EEOC charge, the Court finds it likely that an EEOC investigation could have uncovered Plaintiff's request and the initial stages of the door's negotiation.

The allegedly unlawful fitness for duty evaluation (which arose in mid-2008), however, does not appear to be within the same category as the above claims. This is the most difficult claim to square with the *Hicks* analysis, in that it is the most divorced in time from the filing of the EEOC complaint (certainly, the facts arise well beyond the 180-day minimum investigatory period), and in structural and factual circumstance from the other claims. Plaintiff's loss of consciousness during her shift and Defendant's decision to place her on leave until medical assurance that a recurrence was unlikely seem materially distinct from the initial claims of failure to promote and failure to accommodate. While the Court acknowledges that Defendant's questionnaire to Plaintiff's treating physician and neurologist included various inquiries as to whether her loss of consciousness was related to her multiple sclerosis, the Court does not find this, in itself, sufficient to connect the evaluation to the facts and circumstances of the prior discrimination claims.[20]

_____

transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation to be discrete acts for which the limitations period runs from the act). In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the Supreme Court stated that "discrete discriminatory acts are not actionable if time barred" and "[e]ach discriminatory act starts a new clock for filing charges alleging that act." However, because the failure to promote Plaintiff to the Document Superintendent position occurred within the 300 days preceding the filing of Plaintiff's EEOC Complaint, and because ultimately, on the merits, the claim cannot survive, the Court declines to engage further in this question at the present time.

[20] Moreover, Defendant argues persuasively in its motion for summary judgment that an individualized medical inquiry is permissible under the ADA when an employer has "a reasonable belief, based on objective evidence, that . . . an employee will pose a direct threat."

Furthermore, the Court thinks it unlikely this claim would survive on the merits in light of (1) Plaintiff's lengthy delay in providing Defendant the requested medical information; (2) Defendant's near immediate approval of Plaintiff's return to work upon her submission of that information; (3) Defendant's interest as an oil refinery in ensuring the safety of its workers and surrounding environment; and (4) the fact that Defendant paid Plaintiff for the entire period she was on leave.[21] Thus, the Court will not push the bounds of *Hicks* on this particular claim, and will grant Defendant summary judgment for a failure to exhaust administrative remedies on any claim related to the fitness for duty evaluation.

---

*EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act*, No. 915.002 (7/27/00).

[21] Plaintiff makes an additional argument in her opposition papers concerning the fitness for duty evaluation that the Court will summarize briefly here. Namely, Plaintiff asserts that Defendant unlawfully discriminated against Plaintiff when it required her to undergo a fitness for duty evaluation but did not require Thomas Hutchinson, a male coworker, to undergo the same. [Doc. No. 409]. According to Plaintiff, Plaintiff had given both a 20- and 10- minute warning to switch the relevant tank to Terminal Operator Thomas Hutchinson before she lost consciousness and/or fainted during the May 28 Incident. [*Id.*]. After ten minutes passed and Plaintiff failed to alert Mr. Hutchinson to switch the tanks, Plaintiff asserts that the alarm sounded for 15-20 minutes before co-worker Billy Kalloo came in to revive Plaintiff. [*Id.*]. During this time, Mr. Hutchinson waited for Plaintiff to issue the final instruction to switch the tanks, despite having the option of radioing Plaintiff when he noticed the delay, or making the switch himself by observing the side gauges on the tank. [*Id.*]. Plaintiff alleges that given these facts, and the rumors that Mr. Hutchinson may have had the beginning stages of Alzheimer's, Defendant acted discriminatorily when it failed to either place him on leave and demand a fitness for duty evaluation, or place him on CAPs. [*Id.*].

    In response, Defendant argues that Mr. Hutchinson is not similarly situated to Plaintiff with respect to disciplinary decisions, as he worked in a different department, was supervised by a different manager, held a different job, and was subject to a collective bargaining agreement. [SUMF at ¶ 488]. With respect to Plaintiff's assertions that Mr. Hutchinson may have been suffering from Alzheimer's, Defendant argues that the only evidence proffered by Plaintiff of Mr. Hutchinson's alleged condition is either a conclusory or unsupported allegation, or stems from deposition testimony. [*Id.*]. Given Plaintiff's failure to offer more substantial proof of any mental disability on Mr. Hutchinson's part, the Court finds in favor of Defendant with regard to this claim.

2. <u>Title VII and ADA Claims that Arose after Termination of the EEOC Investigation</u>

With respect to the Title VII and ADA claims stemming from facts occurring after the EEOC's issuance of a right to sue notice, specifically, Plaintiff's placement on CAPs and Defendant's ultimate decision to terminate her employment, Plaintiff contends that Defendant already waived its right to complain about any corresponding administrative deficiencies. The presentation of a Title VII claim to the EEOC, asserts Plaintiff, "is not a jurisdictional [prerequisite], but only a precondition to bringing a Title VII action that can be waived by the parties or the court.'" *Francis v. City of New York*, 235 F.3d 763, 768-69 (2d Cir. 2000). Accordingly, when Defendant failed to oppose Plaintiff's motion to amend her Second Amended Complaint to include the above claims, Defendant allegedly waived any right it may have had to argue the claims were time-barred.

Defendant rebuts Plaintiff's argument by pointing out that it raised a general affirmative defense asserting that Plaintiff had failed to exhaust certain administrative remedies in its Answer to Plaintiff's Third Amended Complaint (and indeed, in each previous Answer as well).[22]  Consequently, argues Defendant, since Plaintiff neglected to file a separate EEOC charge alleging discrimination with regards to her placement on CAPs and her termination, she failed to exhaust her administrative remedies with respect to those claims within the applicable timeframe.  Finding that Defendant did not waive its ability to bring forward a failure to exhaust

---

[22] To preempt any argument that Plaintiff's failure to exhaust administrative remedies should be excused regarding her placement on CAPs or her termination under a theory of "continuing violation," Defendant contends that such actions have been categorized as discrete acts by the Third Circuit. *See O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (finding termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, and wrongful accusation to be discrete acts for which the limitations period runs from the act).  As such, they are discrete acts from which the EEOC filing period begins to run, and for which the applicable statute of limitations has now expired.  Given that these events occurred years after Plaintiff's EEOC filing, the Court agrees they are time-barred.

administrative remedies defense, and finding that such claims are indeed time-barred, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claims under Title VII and the ADA for her placement on CAPs and the termination of her employment.

b. <u>Virgin Islands Civil Rights Act</u>

Having considered Defendant's arguments that certain Title VII and ADA claims are time-barred, the Court now turns to Defendant's arguments regarding claims that might be untimely under VICRA. VICRA prohibits various forms of discrimination based upon race, creed, color, or national origin. 10 V.I.C. § 3. A two-year statute of limitations applies to claims brought within its purview. *See* 5 V.I.C. § 31(5)(A); *Nielsen-Allen*, 285 F. Supp. 2d at 672. As Defendant correctly identifies, VICRA does not protect against disability discrimination.

Given the above time and jurisdictional limitations, Defendant argues that Plaintiff's only remaining claims under this statute that are not time-barred are (1) Defendant's alleged failure to promote her to the positions of Document Supervisor and Document Superintendent on the basis of her race and/or gender; (2) Defendant's alleged retaliation and discrimination against Plaintiff on the basis of her race or gender by putting her on CAPs; and (3) Defendant's alleged retaliation and discrimination against Plaintiff on the basis of her race or gender by terminating her employment. As Plaintiff fails to dispute this assertion, and for good cause shown, the Court finds that the above are Plaintiff's only remaining VICRA claims, and will analyze them below.

II.   Evaluation of those Claims Not Barred Based upon Statute of Limitations and Failure to Exhaust Administrative Remedies

Given the dismissal of certain of the above claims based upon the expiration of the applicable statute of limitations and/or the failure to exhaust administrative remedies, the remaining claims to be considered in this summary judgment motion are those alleging that Defendant (1) retaliated and discriminated against Plaintiff on the basis of her sex and

disability[23] by failing to promote her to the Document Supervisor position in violation of the ADA, Title VII, and VICRA; (2) retaliated and discriminated against Plaintiff on the basis of her race, sex and disability by failing to promote her to the Document Superintendent position in violation of the ADA, Title VII, and VICRA; (3) failed to accommodate Plaintiff pursuant to the ADA with respect to transportation across Defendant's property and the installation of an automatic bathroom door; (4) retaliated and discriminated against Plaintiff on the basis of her race or gender by placing her on CAPs in violation of VICRA; (5) retaliated and discriminated against Plaintiff on the basis of her race or gender by terminating her employment in violation of VICRA; (6) wrongfully terminated Plaintiff; (7) engaged in the intentional infliction of emotional distress; and (8) breached its duty of good faith and fair dealing.  Plaintiff also has one count demanding punitive damages.

The Court will first review the remaining Title VII, VICRA, and ADA claims, before concluding its analysis with a brief review of the claims of wrongful termination, intentional infliction of emotional distress, breach of the duty of good faith and fair dealing, and punitive damages.

Title VII, VICRA and the ADA all protect against unlawful discrimination.  Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000 e-2.  VICRA likewise prohibits various forms of discrimination based upon race, creed, color, or national origin.  10 V.I.C. § 3.  The ADA prohibits discrimination based upon disability, and under its purview an employer must "make

---

[23] Plaintiff has admitted that she does not believe that Defendant's decision not to promote her to the Document Supervisor position had anything to do with her race.  [Pl.'s Resp. to SUMF at ¶ 110].

reasonable accommodations to the known physical or mental limitations of an [employee who is an] otherwise qualified individual with a disability." *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 325 (3d Cir. 2003) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Given their similarities in structure and intent, it is appropriate to advance the inquiry required under each of these statutes pursuant to the three part framework laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. In the context of employment discrimination, a plaintiff has only a "low bar" to overcome in clearing this first hurdle. *Scheidemantle v. Slippery Rock University State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006)*; Ezold v. Wolf*, 983 F.2d 509, 523 (3d Cir.1993) ("In Title VII cases involving a dispute over subjective qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the *McDonnell Douglas* . . . analysis, to avoid putting too onerous a burden on the plaintiff . . . . Because the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement.") (internal citations and quotation marks omitted); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir. 1990) ("The framework set forth in *McDonnell Douglas* . . . was never intended to be rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.") (internal citations omitted).

If a plaintiff can present a *prima facie* case of discrimination, the *McDonnell Douglas* framework dictates that the burden then shifts to the defendant to show a legitimate, nondiscriminatory reason for the employment decision. "If the employer sets forth a legitimate business explanation, then the presumption of discriminatory intent created by the employee's

*prima facie* case is rebutted and the presumption simply drops out of the picture." *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995).

If the defendant can present a creditable, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that the reason provided is mere pretext. *McDonnell Douglas*, 411 U.S. at 807-07.  Under the *McDonnell Douglas* line of cases, a plaintiff attempting to prove that the employer's stated reason is pretextual must demonstrate that "a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  *See also Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) ("A plaintiff can establish pretext in one of two ways: 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.'")); *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999).

Pretext is not established merely by showing an employer's decision was wrong or mistaken. *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997).  "The nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)).

   a.   <u>Plaintiff's Claims for Failure to Promote under Title VII, the ADA, and VICRA</u>

Plaintiff claims Defendant discriminatorily failed to promote her under Title VII, the ADA, and VICRA in two instances: her application for the Document Supervisor position and

33

her application for the Document Superintendent position.  In order to establish a *prima facie* case of failure to promote based upon sex, race, or disability, Plaintiff must demonstrate that she (1) is a member of a protected class; (2) applied for and was qualified for a job for which the employer was seeking applicants; (3) was rejected despite adequate qualifications; and (4) that after her rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.  *Noel v. The Boeing Co.*, 622 F.3d 266, 274 (3d Cir. 2010) (quoting *Fuentes*, 32 F.3d at 763).  Plaintiff must also demonstrate that the person who filled the position had equivalent or lesser qualifications.  *Gilmore v. Macys Retail Holdings, Inc.*, 385 F. Appx. 233, 237 (3d Cir. 2010) (citing *Scheidemantle*, 470 F.3d at 541-42).

In considering the arguments of both parties, the Court is conscious of the discouragement courts receive with regards to second-guessing an employer's decision in the context of promotions or job qualifications.  *See, e.g.*, *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995); *Dungee v. Northeast Foods*, 940 F. Supp. 682, 689 (D.N.J. 1996); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988), *cert denied*, 490 U.S. 1098, 1215 (1989).  Alone, the fact that a candidate with more experience is passed over for one with less experience is not necessarily evidence of pretext.  *See, e.g.*, *Robinson v. Matthews Inter. Corp.*, 368 Fed. Appx. 301, 305 (3d Cir. 2010).

With respect to the Document Supervisor position, the Court finds that Plaintiff has established a *prima facie* case of discrimination, as she is female and disabled; she was admittedly qualified for the position; she was rejected; and the position was awarded to a non-disabled male with equivalent or lesser qualifications.

Thus, Defendant bears the burden of articulating a legitimate, non-discriminatory reason for the employment action.  Here, Defendant argues that its reasons for hiring Mr. Allahar – his

strong work ethic and solid performance as an OMC, excellent interpersonal skills, and an impressive interview during which he submitted a plan for cross-training Terminal Dispatchers and OMCs – were legitimate and nondiscriminatory. Plaintiff gave a strong interview performance, but was not ranked as highly in the areas analyzed by the interviewers, and failed to present a similar plan during her interview. While Plaintiff had worked briefly as a Terminal Dispatcher in addition to her time as an OMC and Mr. Allahar had not, Defendant points out that this was not a requirement for the position, and other applicants who worked as both Terminal Dispatchers and OMCs were also passed over. Moreover, Plaintiff encountered no sexist or racist remarks during her interview and, in deposition testimony, stated that one of the decision makers, Mr. Hailwood, did not discriminate against her. [Doc. No. 359, Pl's. Dep. I, 121:14-16].

Defendant also rejects any effort on the part of Plaintiff to demonstrate discriminatory animus from (1) the fact that there were very few female supervisors in the refinery or (2) Chuck Amalu's comments in the early 2000s that Plaintiff was not selected to act up on the basis of her disability. With regards to the former point, Defendant cites case law stating that evidence of female underrepresentation is insufficient in itself to show discrimination. *See Molthan v. Temple Univ.*, 778 F.2d 955, 962 (3d Cir. 1985); *Masterson v. LaBrum and Doak*, 846 F. Supp. 1224, 1233 (E.D. Pa. Dec. 17, 1993). The Court is careful to mention, however, that these cases do not preclude courts from considering such underrepresentation as part of a larger portrait of discrimination. *See Molthan*, 778 F.2d at 955 (suggesting that specifically honed statistical information may be useful); *Masterson*, 846 F. Supp. at 1233 (finding that "[t]he fact that [the firm] had so few female partners in its history while in itself not sufficient to establish discriminatory practices nevertheless may be considered along with all the other evidence.").

Indeed, "[t]he employer's 'general policy and practice with respect to minority employment' may also be relevant." *Ezold*, 983 F.2d at 524 (quoting *McDonnell Douglas*, 411 U.S. at 804).

With regards to Mr. Amalu's comments, Defendant argues that temporally remote stray remarks from decision makers divorced from the final decision process are unpersuasive as evidence of discrimination. *See, e.g.*, *Ade v. Kidspeace Corp.*, 401 Fed. Appx. 697, 704 (3d Cir. Nov. 15, 2010) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999)). Again, however, the Court is careful to clarify that the Third Circuit has also determined that "[i]n proving that the employer's motive was more likely than not the product of a discriminatory reason instead of the articulated legitimate reason, sufficiently strong evidence of an employer's past treatment of the plaintiff may suffice." *Ezold*, 983 F.2d at 523.

At any rate, the Court finds Defendant has met its burden of offering a legitimate, nondiscriminatory reason in selecting Mr. Allahar over Plaintiff for the Document Supervisor position. The burden then shifts back to Plaintiff to show that the reason given is merely pretextual. In an attempt to undermine Defendant's stated reasoning, Plaintiff points to various alleged inconsistencies in the interview process. To start, Plaintiff maintains that the numerical rankings assigned to Plaintiff and to Mr. Allahar as concerns their experience level – a nearly equivalent ranking – did not adequately reflect the experience differences between the two: Mr. Allahar had only five years of experience as compared to Plaintiff's eighteen, and Mr. Allahar had no training as a Terminal Dispatcher, a position Plaintiff held briefly in the past. [Pl.'s Resp. to SUMF, Ex. 13]. Moreover, the categories by which the interviewers ranked the candidates –

initiative, flexibility, inter-personal skills, and communication skills – were, according to

Plaintiff, too vague without further interpretive instruction.[24]

Plaintiff also points out that while Mr. Allahar was credited with bringing an impressive

proposal for cross-training dispatchers and OMCs to his interview, Plaintiff had also, on a prior

occasion, brought forth a plan to improve the department by reducing tank contamination, and,

consistent with her characterization, seems to have been credited by at least one of the

interviewers with "constantly suggest[ing] ways to improve the performance of the OMC's."

[Pl.'s Resp. to SUMF, Ex. 10].  Indeed, during the interview process Plaintiff was described as a

top OMC whose work record supported a dedication to her job, despite the later explanation that

she was passed over for promotion given her work history.  [Pl.'s Resp. to SUMF, Ex. 14].[25]

Plaintiff further asserts that there was impermissible consideration of her disability by at

least one of the interviewers, based upon his later admission in deposition testimony that it had

"crossed his mind" whether or not she might be physically unable to perform some of the duties

and responsibilities of the Supervisor position, stating "she might have been restricted, because

there's quite a bit of movement to and fro . . . within the terminal."  [Doc. No. 347, Hailwood

Dep. at 31:10-16].

Finally, Plaintiff asserts that there were impermissible considerations based upon her sex,

as evidenced by Mr. Mehalko's interview notes while investigating Plaintiff's internal

discrimination claim.  At one point in his investigatory interview with panel interviewer Mr.

---

[24] The Court notes upon review of the interview files that these categories did in fact have short
descriptions underneath the 1-5 scale for each trait, at least with respect to the meaning of '1' and
the meaning of '5'.  [*See, e.g.*, Doc. No. 362, Ex. 5].

[25] After the interviews, at least one of the interviewers considered the candidates' disciplinary
histories and determined that Mr. Allahar had fewer incidents than the other candidates,
including Plaintiff.  [SUMF at ¶ 104; Doc. No. 408 at ¶ 104]. Plaintiff disputes that this is a
legitimate comparison, as Mr. Allahar's fewer years at the company would likely mean he had
fewer mistakes in his history.  [Doc. No. 408 at ¶ 104].

Williams, Mr. Mehalko wrote under the heading "Shift/Night work?" the following lines: "OMC call in sick – don't like calling in female shift worker. If have choice-goes to male. Safety issue-drive on island. Woman ever come in @ night? Yes, all the time." [*Id.*, Ex. 11]. Defendant notes in its response to Plaintiff's use of Mr. Mehalko's interview notes that there has been no deposition testimony explaining the meaning of the interview notes, thus undermining their utility for analysis.

Despite Plaintiff's attempts to counter Defendant's proffered legitimate reasons for hiring Mr. Allahar, the Court finds that any jury considering this issue would merely be engaged in an improper "second-guessing" of Defendant's decision. The ambiguous interview notes from Mr. Mehalko and Mr. Amalu's statement from years before Plaintiff's application are simply not enough to show that Plaintiff was discriminated against when passed over by a three-person panel for the Document Supervisor position. Mr. Hailwood's comment regarding Plaintiff's mobility – while expressed in deposition testimony – does not appear to have been discussed by the panel or factored into its analysis.

While the interview panel did not select Plaintiff, it did rank her in its top three candidates. To account for this difference, Defendant has proffered much evidence concerning Mr. Allahar's strong interview and overall performance, and, as summarized in the Background section of this Opinion, provided sufficient evidence of Plaintiff's disciplinary history so as to lend credibility to its partial reliance on her record in her ultimate rejection. Finally, although the numerical rankings assigned to Mr. Allahar and Plaintiff were similar with respect to their experience, the Court notes that it is entirely reasonable for an employer to consider a range of experience sufficient for a position, and Plaintiff has not shown that Mr. Allahar's experience was not.

Thus, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claim that Defendant violated Title VII, the ADA, and VICRA when it failed to promote her to the Document Supervisor position.

Turning to the question of the Document *Superintendent* position, Defendant takes a more aggressive approach, arguing that Plaintiff has fallen short of establishing even a *prima facie* case of discrimination. Defendant asserts that Plaintiff has failed to show (1) that she was qualified for the position or (2) that after her rejection the position was given to someone with equivalent or lesser qualifications. As concerns *Plaintiff's* qualifications, Defendant observes that since the Document Superintendent supervises the Document Supervisors, it would be nonsensical to reject Plaintiff for the lower-level supervisor position only to then elevate her soon thereafter to the higher-level superintendent position. As concerns whether or not Kyle Lee was appropriately qualified and hired, Defendant found Mr. Lee to have significantly more managerial experience (both more extensive and more recent than Plaintiff's) and to be a higher-level player in the industry.[26]

Plaintiff, in response, argues that she was qualified for the position, which required that the candidates have at least ten years' experience in Terminal Operations (she had eighteen) and two years' supervisory experience (which she earned while working as a Dock Foreman in 1994 and as an assistant manager at a retail establishment prior to employment with Defendant). [Pl.'s Resp. to SUMF at ¶ 116]. Moreover, Plaintiff argues that Defendant interviewed two male candidates who had less supervisory experience than Plaintiff: Trevor Liburd, who had only *one* year of management experience, and Raphael Garcia, who had *no* supervisory experience. [Pl.'s

---

[26] According to Defendant, Mr. Lee had approximately ten years of managerial experience in the petroleum industry, working as a branch manager and a field supervisor. [SUMF at ¶ 127]. Additionally, Mr. Lee had managerial experience as recent as 18 months prior to his interview, [SUMF at ¶¶ 127, 136], as compared with Plaintiff's two years of supervisory experience, the most recent period of which ended in 1994.

Resp. to SUMF at ¶ 130].  Defendant rebuts these last contentions, contending that Mr. Liburd's resume indicated five years of work experience as either an Operations Manager or as a Field Manager, [Doc. No. 362, Ex. 7, Part 2], and that there is very little evidence to show that Mr. Garcia was interviewed at all – only one of the interviewers stated that he *thought* Mr. Garcia had been interviewed, [Doc. No. 347, Hailwood Dep. 47:23-24, 48:7].

Upon review of the relevant evidence and factors, the Court finds that in the case of the Document Superintendent position, Plaintiff cannot show that the position went to someone who was equally or less qualified, and thus, has failed to make out a *prima facie* case for discrimination.  The Court therefore grants Defendant's motion for summary judgment with regards to any Title VII, ADA, or VICRA claims related to the Document Superintendent position.

b. Plaintiff's Claims for Failure to Accommodate under the ADA

Plaintiff's claims for a failure to accommodate pursuant to the ADA center around two accommodation requests[27]: transportation across Defendant's property – specifically, Plaintiff's request to drive her own vehicle to her workstation – and installation of an automatic bathroom door to the first-floor bathroom closest to her work station.  To establish a *prima facie* case for failure to accommodate under the ADA, Plaintiff must demonstrate that: (1) Defendant knew about Plaintiff's disability; (2) Plaintiff requested accommodations or assistance for her disability; (3) Defendant did not make a good faith effort to assist Plaintiff in seeking accommodations; and (4) Plaintiff could have been reasonably accommodated but for Defendant's lack of good faith.  *Conneen*, 224 F.3d at 330-31 (quoting *Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3d Cir. 1999)) (internal quotations omitted).

---

[27] Plaintiff's third asserted request, concerning installation of an interior ramp to the computer room, was dismissed as time-barred earlier in this Opinion.

Under regulations promulgated pursuant to the ADA, the definition of a reasonable accommodation encompasses: (1) a "modification[] or adjustment[] to the work environment . . . that enable[s] a [qualified individual] to perform the essential functions of that position;" or (2) a "[m]odification[] or adjustment[] that enable[s] a covered entity's [disabled] employee . . . to enjoy equal benefits and privileges of employment as . . . similarly situated [non-disabled] employees."  29 C.F.R. § 1630.2(o)(2)(1)(ii) and (iii).

The applicable regulations further state that if an individual is a qualified employee under the ADA and requests accommodations for his or her disability, it becomes the responsibility of the employer to engage the employee in the interactive process of finding accommodations.  29 C.F.R. § 1630.2(o)(3); *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006); *Conneen*, 334 F.3d at 329.  The burden is on the employer "to request additional information the employer believes it needs."  *Taylor*, 184 F.3d at 315.  However, it should be noted that "both parties bear responsibility for determining what accommodation is necessary" and that "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."  *Taylor*, 184 F.3d at 312 (quoting *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996)) (internal quotations omitted).  A party ceases to act in good faith when it "obstructs or delays the interactive process," or "fails to communicate, by way of initiation or response."  *Id.* (quotations omitted).  "In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility."  *Id.* (quotations omitted).

Here it is undisputed Defendant knew of, and that Plaintiff requested accommodations and assistance for, her disability, both with respect to transportation and to the automatic bathroom door.  The disagreement between the parties instead appears to principally gather

around whether or not Defendant made a good faith effort to engage Plaintiff in the requisite interactive process for the two accommodation requests in issue.

With regards to Plaintiff's allegations that Defendant failed to appropriately accommodate her transportation across Defendant's property, it appears from the evidence that Defendant did make a good faith effort to assist Plaintiff in seeking accommodations and to engage in the interactive process. While Defendant did not ultimately allow Plaintiff to drive her personal vehicle into the refinery, Defendant correctly points out that, "[t]he ADA only provides a right to a reasonable accommodation, not the employee's preferred accommodation." *See Stadtmiller v. UPMC Health Plan, Inc.*, 799 F. Supp. 2d 492, 509 (W.D. Pa. 2011); *Whitfield v. Pathmark Stores, Inc.*, 1999 U.S. Dist. LEXIS 7096, *24, fn. 15 (D. Del. Apr. 29, 1999).

Over the course of her employment, Defendant arranged for a taxi, a shuttle, and co-workers to transport Plaintiff, changing the mode of transportation over time upon Plaintiff's request. The Court agrees with Defendant that Plaintiff's difficulty securing a pass through an administration building to reduce the distance Plaintiff walked each day was a separate event many years prior, and further finds that, based upon the evidence presented, Defendant in good faith attempted to remedy any delay with issuing the pass once Plaintiff contacted Defendant's company president. The Court thus concludes that the evidence evinces a good faith effort on the part of Defendant to assist Plaintiff in seeking transportation accommodations, even if it did not ultimately provide the exact accommodation Plaintiff requested.

Turning to the issue of the automatic bathroom door, the Court notes that this dispute is of a slightly different nature in that Defendant *did* ultimately provide Plaintiff's preferred accommodation. Plaintiff's argument centers instead on Defendant's *delay* in the provision of

the automatic door, on the grounds that Defendant's delay was the product of a breakdown of a good faith effort to engage in the interactive process.

In its moving papers, Defendant's argument proceeds along various fronts. First, Defendant notes that Plaintiff fails to allege the installation delay was intentional, a generally accepted prerequisite for receiving compensatory damages on an ADA claim. *See e.g.*, *Chambers v. School Dist. Of Philadelphia Bd. of Educ.*, 827 F. Supp. 2d 409, 422-23 (E.D. Pa. 2011) (finding that, despite Third Circuit's failure to rule on the issue, all other circuits to have considered it have found intentional discrimination necessary for the award of compensatory damages).

Second, Defendant emphasizes that Plaintiff was on administrative leave during fourteen of the twenty-three months it took to install the door, shrinking the time Plaintiff was forced to deal with the inconvenience of a non-automatic door by more than half. Third, Defendant seeks to undercut the characterization of the automatic door as a necessary accommodation by pointing to Plaintiff's testimony that Plaintiff was able to use the restroom without the automatic door. [*See, e.g.*, Doc. No. 360, Pl.'s Dep. II at 103:5-8]. Even after the automatic door was installed, Defendant cites deposition testimony by another employee that Plaintiff continued to occasionally use the second floor bathroom with a non-automatic door for increased privacy. [Doc. No. 355, Williams Dep. 200:23-25].[28]

Plaintiff, in her Opposition papers, attempts to rebut Defendant's attack on the automatic door as a necessary accommodation by pointing out that Defendant initially provided a scooter to Plaintiff because she had fallen on multiple occasions. Without an automatic bathroom door,

---

[28] While Plaintiff technically says that she disputes this fact in her response to Defendant's Summary of Undisputed Material Facts, the Court notes that the information she proffers confirms Defendant's characterization of the testimony, and provides no true objection to its content. [*See* Pl.'s Resp. to SUMF at ¶ 200].

Plaintiff had to leave her scooter outside of the bathroom and walk in, risking a fall.  Plaintiff further cites an email from Mr. Amalu describing the automatic bathroom door as an "ADA issue" and the desire to treat its procurement as an emergency.  [Pl.'s Resp. to SUMF, Ex. 22].

Finally, Plaintiff argues that Defendant failed to present any evidence of mitigating circumstances to justify the delay or demonstrate that the request created an undue hardship. *See, e.g.*, *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 761 (3d Cir. 2004) (quoting 42 U.S.C. § 12112(b)(5)(A)) ("The ADA specifically provides that an employer 'discriminates' against a qualified individual . . . when the employer does 'not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship . . . .'" (internal punctuation omitted)).

As an initial matter, the Court notes that accessibility to a bathroom seems to clearly fall within the bounds of what is reasonable and necessary.  *See, e.g.*, *Scalera v. Electrograph Systems, Inc.*, 848 F. Supp. 2d 352, 365-66 (E.D.N.Y. 2012) ("[B]eing able to use the restroom at work can allow an employee to perform the essential functions of the job."); *Lerman v. Xentel, Inc.*, 2009 WL 4632881, at *5 (S.D. Fl. 2009) ("The Court finds that being able to use the restroom at work can allow an employee to perform the essential functions of the job."). Moreover, nine months is a significant delay[29] – certainly significant enough to be termed unreasonable under the case law in this area.  *See, e.g.*, *Krocka v. Riegler*, 958 F. Supp. 1333, 1342 (N.D. Ill. 1997) (refusing to dismiss Plaintiff's claim that he was denied a reasonable

---

[29] The Court does not consider 23 months to be the proper measure of time in this instance, given that Plaintiff was on leave for 14 months of that time.  *See, e.g.*, *Terrell v. USAir*, 132 F.3d 621, 628 (11th Cir. 1998) (finding delay not unreasonable where employer failed for thirteen months to accommodate employee's carpal tunnel syndrome by providing full-time use of a drop keyboard, where Plaintiff was on leave for ten of those months and had intermittent use of a drop keyboard in the meantime).

accommodation where Defendants delayed eight months in granting assignment change request, and where such request was initially outright denied).

Although circuit precedent counsels the Court to assign responsibility for the breakdown in the interactive process, neither party appears to have proffered much evidence as to the effort each put into communications regarding the door over the course of the relevant nine months. Despite this ambiguity, which may in other circumstances lead to a genuine issue of material fact, the Court nonetheless finds that Plaintiff has failed to show that Defendant did not make a good faith effort to assist Plaintiff in seeking accommodations, and thus, has not established a *prima facie* case of a failure to accommodate.

The Court reaches this conclusion based upon the principle that, "where an employer has successfully made reasonable accommodations, a court can conclude as a matter of law that the employer did not act in bad faith." *Taylor*, 184 F.3d at n. 9. Here, the Court finds that Defendant did indeed provide reasonable accommodations. To start, it appears that Defendant never denied Plaintiff's request for an automatic door. While there was a delay in its installation, there is evidence that the beginning stages to seek approval for the project were in progress, [*see* Pl.'s Resp. to SUMF, Ex. 22, Amalu Email Chain], and that Defendant in an early interrogatory indicated that the process for installation had been reinitiated as of April 1, 2008, with a projected installation of 2009. [*See* Pl.'s Resp. to SUMF, Ex. 24]. The door was indeed installed by Plaintiff's return in mid-2009.

While Plaintiff may have had to wait for her preferred accommodation, the Court finds that Defendant in the interim provided Plaintiff with a scooter and a cane, in addition to providing for the requisite upkeep for those items.[30] Assumedly, Plaintiff could use the cane to

---

[30] *See* Pl.'s Resp. to SUMF, Ex. 22 (email remarks concerning replacement of tripod end of Plaintiff's cane).

assist with going in and out of the bathroom.  Moreover, the first floor bathroom had been renovated during Plaintiff's employment tenure so as to be ADA compliant,[31] and there is no testimony that the bathroom's interior did not accommodate Plaintiff's disability.

While the Court acknowledges that Plaintiff's chances of falling likely increased when she had to get up and out of her chair, Plaintiff has not given any indication that failure to provide the automatic door prevented her from fulfilling her employment obligations.  Moreover, Plaintiff does not effectively dispute the deposition testimony that Plaintiff still occasionally used bathrooms with non-automatic doors, even after an automatic door was installed.

Given the lack of evidence that Defendant was either (a) responsible for a breakdown in the interactive process or (b) that Defendant acted in bad faith with respect to the delay in provision of the automatic door; and given the previous finding that Defendant engaged in a good faith interactive process with Plaintiff to provide transportation across Defendant's property and otherwise provided reasonable accommodations, the Court grants summary judgment in favor of Defendant regarding Plaintiff's claims for failure to accommodate under the ADA.

c. Plaintiff's Claims of Discrimination Based upon Her Placement on CAPS and the Ultimate Termination of Her Employment

Plaintiff claims that, in comparison with other OMCs, Defendant discriminatorily subjected Plaintiff to harsher discipline in violation of VICRA when it placed her on CAPs and ultimately terminated her employment.  A plaintiff establishing a *prima facie* case of disparate treatment must offer sufficient evidence that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) similarly

---

[31] For the purposes of this analysis, the Court does not find it significant whether Plaintiff or Defendant initiated the first floor bathroom renovation.

situated non-members of the protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802.  The Court will first analyze Plaintiff's claim that she was subjected to discriminatorily harsh discipline when she was placed on CAPs, before turning to Plaintiff's employment termination claim.

i. Plaintiff's Placement on CAPs

With respect to Plaintiff's placement on CAPs, Defendant cites Plaintiff's testimony that Defendant's decision to place Plaintiff on CAPs was not related to her race, gender, or disability. [SUMF at ¶ 432; Pl. Dep. II 244:8-11].  Because of this testimony, argues Defendant, Plaintiff's allegations that she was unlawfully disciplined in violation of VICRA must fail as a matter of law.[32]

Plaintiff, in her response to Defendant's Summary of Undisputed Material Facts, attempts to dispute this particular deposition testimony by pointing to other places in her deposition where she testified (1) that Mr. Hoffman had not been placed on CAPs for incidents that occurred while he was an OMC; (2) that Defendant placed her on CAPs for having gotten sick on the job and having to leave work; (3) that she felt she was being chastised by Defendant for leaving work early on September 3, 2010 for illness; and (4) that out of all the people who contributed to the errors on September 3, she was the only one placed on CAPs.  [Pl.'s Resp. to SUMF at ¶ 432].

---

[32] Defendant offers various other arguments to refute a CAPs claim, in both its moving papers and in its reply.  In its moving papers, Defendant argues that even without Plaintiff's deposition testimony, Plaintiff would be unable to establish a *prima facie* case of discrimination because (1) CAPs (a corrective action plan) does not amount to an adverse employment action and (2) Plaintiff cannot identify a similarly situated employee outside of her protected class who was treated more favorably.  Even if Plaintiff could establish a *prima facie* case of discrimination, Defendant asserts it had legitimate non-discriminatory reasons for placing Plaintiff on CAPs when Plaintiff reported to work on September 3, 2010, despite feeling unwell, and subsequently committed a series of serious errors.  Finally, Defendant contends in its reply brief that since Plaintiff seemingly fails to address the CAPs issue directly in her Opposition brief, she concedes that summary judgment on this issue is appropriate.

The Court finds that Plaintiff's rebuttal evidence falls short of directly contradicting her statement concerning Defendant's motivation in placing her on CAPs. Thus, the Court grants summary judgment in favor of Defendant in response to any claim Plaintiff may have had under VICRA in relation to her placement on CAPs.

ii. Termination of Plaintiff's Employment

Defendant argues that Plaintiff's claim of discriminatory discharge under VICRA must also fail. Attacking Plaintiff's potential *prima facie* case, Defendant asserts that with respect to the September 3 and the October 18 Incidents, Plaintiff is unable to show she was qualified for the OMC position (given the multiple errors on September 3 and October 18). Neither, according to Defendant, can Plaintiff identify any similarly situated employees outside of her protected class who were treated more favorably. Defendant further contends that even if Plaintiff could establish a *prima facie* case of discriminatory termination, Defendant's decision to terminate Plaintiff after her significant errors and failure to report illness a mere three days after she had been placed on CAPs was legitimate and non-discriminatory.

Distilling the essential arguments from Plaintiff's Opposition brief, in which she seemingly blends her analysis of CAPs and employment termination, Plaintiff argues that she (1) was qualified for the position, as she had received medical clearance for a return to work; and (2) other employees in a similar situation were treated more favorably: specifically, Ms. Pierre and Mr. Hoffman.

The Court is unwilling to go so far as to agree that Plaintiff was unqualified for the position, as the evidence presented is only that Plaintiff was ill and failed to report the illness. With regards to whether or not other employees in a similar situation were treated more favorably, the Court finds that Plaintiff does not sufficiently allege evidence so as to establish a

48

*prima facie* case for discriminatory dismissal based upon race or sex under VICRA.  Ms. Pierre is a black female, and, while Mr. Hoffman is a white male, the Court finds there to be insufficient information with respect to his disciplinary history and the difference in his work history (he appears to have changed from an OMC to a Terminal Dispatcher) to be persuaded that he was similarly situated, or that his treatment alone demonstrates a discriminatory preference based upon sex or race.

Thus, the Court grants Defendant's motion for summary judgment on Plaintiff's claims of Discrimination Based upon Her Placement on CAPS and Her Ultimate Employment Termination under VICRA.

### d.  Plaintiff's Claim of Wrongful Discharge

The Virgin Islands Wrongful Discharge Act ("WDA") serves as a statutory limitation on at-will employment in the Virgin Islands.  24 V.I. § 76, *et seq*.  Specifically, the WDA lists nine grounds on which, unless modified by union contract, an employer may lawfully dismiss an employee.  24 V.I. § 76(a)(1)-(9).  If any employee is "discharged for reasons other than those stated . . . [that employee] shall be considered to be have been wrongfully discharged."  *Id.* at § 76(c).

In this instance, Defendant argues that Plaintiff has failed to provide a response to Defendant's motion for summary judgment claim regarding wrongful discharge, and therefore, has conceded the issue to Defendant.  While the Court ordinarily would agree with Defendant, in this case there is sufficient overlap between Plaintiff's arguments regarding discriminatory termination under Title VII, the ADA, and VICRA and the claim of Wrongful Discharge to warrant evaluation.  This is especially so given the similar mode of analysis between the above claims and the WDA.

In *Rahbahadoorsingh v. Chase Manhattan Bank*, 168 F. Supp. 2d 496 (D.V.I. 2001), the district court applied the *McDonnell Douglas* burden-shifting framework to the WDA claim, despite the slightly different elements required to support a claim under the WDA.  This has subsequently been adopted by the Territorial Courts.  *See, e.g.*, *Fenton v. C&C Constr. & Maint., Inc.*, 48 V.I. 263 (V.I. 2007).  To establish a *prima facie* case under the WDA, then, Plaintiff must first demonstrate that: (1) she was an employee; (2) of a covered employer; (3) she was discharged; and (4) the discharge was wrongful.  *See Fenton*, 48 V.I. 263.  The burden then shifts to Defendant to "offer[] one or more of the statutorily-approved reasons for its actions" before "the burden of production [shifts back] under the third and final prong . . . to [P]laintiff to show, by a preponderance of the evidence, that the proffered reason is pretextual."  *Rahbahadoorsingh*, 168 F. Supp. 2d at 505.  "To satisfy this burden, the discharged employee must produce some direct or circumstantial evidence from which a factfinder could reasonably (1) disbelieve the employer's articulated legitimate reasons or (2) believe that a non-WDA approved reason was more likely than not a motivating or determining cause of the employer's action."  *Id.* (citing *Fuentes*, 32 F.3d at 764).

Defendant, in its moving papers, immediately moves to attack the fourth prong of the *prima facie* case: that the discharge was wrongful.  Because the WDA provides that "an employer may dismiss any employee . . . who performs [her] work assignments in a negligent manner," 24 VIC § 76 (a)(5), Defendant argues that Plaintiff, as a result of the negligent manner in which she performed her work during the September 3 and October 18 Incidents, cannot establish her discharge was wrongful.

Plaintiff, in her general argument that her discharge was based upon improper discriminatory motive, attempts to compare Defendant's disciplinary decisions in her case to its

50

disciplinary decisions in other cases.  In significant part, Plaintiff cites an August 2005 incident

in which two fellow OMCs, Ms. Pierre and Mr. Hoffman (who has since transferred to the

position of Terminal Dispatcher) failed to monitor the temperature inside of a tank, causing

steam to be released and the roof to expand such that it had to be replaced at a cost of between

half a million and a million dollars.  [Pl.'s Resp to SUMF at ¶ 505].  Ms. Pierre was put on CAPs

for her role in the incident (her third placement on CAPs), but not terminated.  Mr. Hoffman

appears *not* to have been put on CAPs for his role in the incident.

Defendant argues that the comparison between Plaintiff and Ms. Pierre and Mr. Hoffman

is inapposite, as the incident involving Ms. Pierre and Mr. Hoffman occurred over half a decade

earlier, under a different manager, involved different conduct, and did not occur while either was

on CAPs.  *See, e.g.*, *Opsatnik v. Norfolk Southern Corp.*, 335 F. Appx. 220, 223 (3d Cir. 2009)

(quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)); *Radue v. Kimberly-Clark

Corp.*,  219 F.3d 612, 617-18 (7th Cir. 2000)) ("While 'similarly situated' does not mean

identically situated, the plaintiff must nevertheless be similar in all relevant respects . . . .often

[this] includes a 'showing that the two employees dealt with the same supervisor, were subject to

the same standards, and had engaged in similar conduct . . . . '").[33]

Here, the Court is persuaded that Plaintiff's termination was not wrongful based upon the

facts.  To start, while Plaintiff's termination may, on paper, seem abrupt (a mere three days after

---

[33] Plaintiff argues that to require the same supervisor over different periods of time would in
many instances be futile and defeat the purpose of the anti-discrimination statutes.  Plaintiff also
attempts to establish an inconsistency in Defendant's disciplinary reasoning.  On the one hand,
Defendant argued that it did not discipline its employees based upon the consequences of an
error, but upon an employee's deviation from established policies and procedures.  On the other,
Defendant has repeatedly emphasized the possibly catastrophic consequences of Plaintiff's
errors.  Unlike Plaintiff, however, the Court does not find these two positions inconsistent; on the
contrary, the Court finds them to be two sides of the same attempt to minimize the chance for
error and mishap.

her placement on CAPs), her termination was far from without warning.  First, the terms of her CAPs notice specifically stated that any failure on Plaintiff's part to improve performance within the stated disciplinary period could result in further disciplinary action, up to and including termination.  The Court further finds it significant that Plaintiff was placed on CAPs due to her previous failure to notify management that she was unfit to work during the September 3 Incident because of illness.  Her failure to notify management of her illness again on October 18, then, showed a direct lack of improvement from her September 3 performance.

However, even if one were to argue that placement on CAPs still does not preempt the WDA, the Court finds that Defendant's argument that Plaintiff conducted her work in a negligent manner effectively rebuts any presumption that her discharge was wrongful.  Given the critical nature of the OMC's operations in ensuring the safe and cost efficient transfer of oil within the refinery, Plaintiff was under a duty to inform her supervisors of her illness and seek relief.  Given her previous placement on CAPs, Plaintiff was aware of this duty.  However, because she failed to alert her supervisor, she remained on shift and made several mistakes.  Even if the mistakes did not result in significant damage to Defendants at that time, the statute merely requires that an employee's work be performed in a negligent "manner," 24 V.I. § 76(a)(5), relieving Defendant of the burden of proving actual damages.

Thus, given that an employer may fire an employee who performs her work assignments in a negligent manner, and given Plaintiff's extensive disciplinary record leading up to her termination, the Court finds that Plaintiff cannot establish a *prima facie* case of wrongful discharge in this instance.  The Court therefore grants summary judgment in favor of Defendant on the WDA claim.

e.   Plaintiff's Claim of Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must show: "(1) she engaged in protected activity; (2) materially adverse action was taken against her; and (3) there was a causal connection between the protected activity and the material adverse action." *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  To establish the "causal link" element, Plaintiff must prove the protected activity and the negative employment action are not completely unrelated.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-82 (3d Cir. 2000).  Should Plaintiff make a *prima facie* showing of retaliation, Defendant must then proffer a legitimate, non-retaliatory reason for the adverse action, which Plaintiff would in turn have to demonstrate was pretextual.  *Moore*, 461 F.3d at 342.

In support of its argument, Defendant draws attention to the length of time between the filing of her May 2007 lawsuit and her placement on CAPs and termination – a period of approximately three and a half years.  Defendant asserts that based upon Plaintiff's testimony, the only direct evidence demonstrating retaliation was a 2006 comment from Robert Williams that he would not speak to her concerning denial of her promotion for Document Supervisor because he heard she was going to file a lawsuit.  This remote and unrelated event, argues Defendant, can hardly support a *prima facie* case for retaliation.  Finally, Defendant once again asserts legitimate business reasons for placing Plaintiff on CAPs and terminating her employment.

As Plaintiff neglects to present any counterarguments in her Opposition papers, and for good cause shown, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claims of retaliation.

f.  Claim for Intentional Infliction of Emotional Distress

To support its motion for summary judgment on the claim of intentional infliction of emotional distress, Defendant cites to § 46 of the Restatement (Second) of Torts (1977) for the proposition that: "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." According to Defendant, Plaintiff has failed to make a showing that Defendant's conduct has been so intentionally outrageous in character, and so extreme in degree, as to warrant liability on this claim, and that she has also failed to establish she has suffered a significant degree of distress.[34]  Defendant argues further that, "termination of employment does not, without evidence of harassment, support a claim of intentional infliction of emotional distress." *McNemar v. Disney Store*, 91 F.3d 610, 623 (3d Cir. 1996).

Plaintiff neglects to present counterarguments with respect to the claim of intentional infliction of emotional distress in her opposition papers.  For good cause shown, then, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claim.

g.  Claim for Breach of the Duty of Good Faith and Fair Dealing

Defendant also argues that Plaintiff fails to allege acts of fraud or deceit amounting to a violation of the obligation of good faith and fair dealing implicit in every Virgin Islands Employment Contract. *Tween v. Metro Motors, SC, Inc.*, 2008 U.S. Dist. LEXIS 107542, *23-24 (D.V.I. Feb 28, 2008).  As Plaintiff presents no evidence to the contrary, and for good cause shown, the Court grants Defendant's motion for summary judgment with respect to this claim.

---

[34] During her deposition, Plaintiff testified that she has never seen a psychological professional for treatment of her alleged distress, and that her distress is limited to stomach issues, anger, headaches, stress, and a decreased sex drive. [SUMF at ¶ 520].

h. Claim for Punitive Damages

Upon consideration of Plaintiff's punitive damages claim, it is to be noted that such a claim would be bi-furcated at trial. Moreover, punitive damages in an employment case such as this on these close facts would likely be unwarranted. However, in light of the Court's award of summary judgment to Defendant on each of Plaintiff's plausible claims, the Court finds the issue of punitive damages moot.

MOTION FOR SANCTIONS

DISCUSSION

Plaintiff has moved for the imposition of sanctions under 28 U.S.C. § 1927, [Doc. No. 412], alleging that Defendant unreasonably and vexatiously multiplied the proceedings by filing 524 paragraphs of facts in support of its Motion for Summary Judgment. The Court finds such sanctions to be unwarranted in this case. Under 28 U.S.C. § 1927, a court may impose certain sanctions on an attorney that "has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct." *In re Shaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir. 2008).

While the Court agrees that Defendant's Statement of Undisputed Material Facts is significant in length, the Court notes that this litigation has been resplendent with filings that have extended the life and cost of this litigation. Moreover, this suit has extended over several years, with extensive discovery and evolving party claims. Finally, the Court itself has reviewed the entirety of Defendant's Statement of Undisputed Material Facts[35] multiple times in its consideration of Defendant's summary judgment motion. In the context of all of the above, therefore, the Court finds Defendant's Statement of Undisputed Material Facts proportionate to

---

[35] As well as reviewed Plaintiff's and Defendant's subsequent responses.

55

the litigation, and not the type of vexatious and unreasonable submission that § 1927 was meant to guard against.  Therefore, the Court denies Plaintiff's motion.

CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion for summary judgment with respect to all claims.  [Doc. Nos. 373-74].  The Court further denies Plaintiff's motion for sanctions.  [Doc. No. 412].  An appropriate Order accompanies this Opinion.

ANNE E. THOMPSON, U.S.D.J.

Date: April 4, 2013