NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF THE VIRGIN ISLANDS
ST. CROIX DIVISION

Casandra PAUL,

    Plaintiff,

v.

HOVENSA L.L.C.,

    Defendant.

Civ. No. 1:07-cv-00051-AET-GWC

OPINION

THOMPSON, U.S.D.J.

    This matter has come before the Court on Defendant Hovensa L.L.C.'s ("Defendant's") Motion for Summary Judgment, [Doc. Nos. 373-74], and Plaintiff Casandra Paul's ("Plaintiff's") Motion for Sanctions under 28 U.S.C. § 1927, [Doc. No. 412]. Both motions are opposed. [Doc. Nos. 408-09, 422]. The Court has decided the motions based upon the submissions of the parties and without oral argument, pursuant to Federal Rule of Civil Procedure 78(b). For the reasons stated herein, Defendant's motion for summary judgment is granted and Plaintiff's motion for sanctions is denied.

BACKGROUND

    The present action arises from Plaintiff's claims of discrimination on the basis of sex, disability, and race in violation of Title VII of the Civil Rights Act of 1967, ("Title VII"), 42 U.S.C.A. §§ 2000e, *et seq.*; the Virgin Islands Civil Rights Act, ("VICRA"), 10 V.I. § 64; and Title I of the Americans with Disabilities Act, (the "ADA"), 42 U.S.C. §§ 12101, *et seq.* [Doc. No. 120-1, "Third Amd. Compl."]. Plaintiff further alleges violations of the Virgin Islands

Wrongful Discharge Act ("WDA"), and asserts claims of retaliation, the intentional infliction of emotional distress, breach of the implied duty of good faith and fair dealing, and punitive damages. [Doc. No. 120-1, Third Amd. Compl.].

Defendant, an oil refinery located in the U.S. Virgin Islands, St. Croix, hired Plaintiff, a black female, in 1988 as a Terminal Dispatcher. [Doc. No. 374, Def.'s Statement of Undisputed Mat. Facts[1], "SUMF," at ¶¶ 1-2; Doc. No. 120-1, Third Amd. Compl., at ¶ 2]. In October 1992, Plaintiff was promoted to Dock Foreman where she supervised the dock attendants and ship tie-up crew. [SUMF at ¶¶ 1, 9-10]. In May 1994, Plaintiff became an Oil Movement Coordinator ("OMC"), a position she held until her termination in November 2010. [SUMF at ¶¶ 11-12]. An OMC monitors and coordinates oil movement from tank to tank, ship to tank, tank to ship, tank to unit, and unit to tank. [SUMF at ¶ 21]. From July 2000 until her termination, Plaintiff's immediate supervisors were, in the following order, Michael Low, Chukwuka ("Chuck") Amalu, and Rollin Allahar. [SUMF at ¶ 13].

I. Multiple Sclerosis Diagnosis and Initial Requests for Accommodation

In March 2000, Plaintiff was diagnosed with multiple sclerosis. [SUMF at ¶ 69]. As a result, Plaintiff had difficulty walking without the aid of a cane, and had dexterity issues with her hands such that writing was difficult. [SUMF at ¶¶ 70-71]. The parties agree that despite these issues, Plaintiff's condition did not affect her ability to work or perform the duties and responsibilities of an OMC, or prohibit her from complying with any of Defendant's policies and procedures. [SUMF at ¶ 72].

---

[1] Simple citations to Defendant's Statement of Undisputed Material Facts refer to those facts undisputed by Plaintiff. Where there is some apparent dispute but the citation is still to Defendant's Statement of Undisputed Material Facts, the Court has attempted to distill and include here that version of events that falls along the points of agreements between the parties. Otherwise, statements are Court findings of fact from an independent review of the evidence.

2

After her diagnosis, Plaintiff requested several accommodations to help her with the above-mentioned mobility issues. [SUMF at ¶ 155]. One such accommodation involved the installation of a ramp for her workspace in the computer room (also referred to in the papers as "the control room"). [SUMF at ¶¶ 201; 221; Doc. No. 371, Willie-Paul Aff., Ex. A; Doc. No. 342, Amalu Dep., 86:11-13]. Plaintiff requested the ramp at some point in 2003 and was told that one would be installed after the Christmas holiday. [SUMF at ¶¶ 201; Doc. No. 408, "Pl's Resp. to SUMF," at ¶ 201]. After an incident in which Plaintiff tripped in January 2004, Defendant installed the ramp. [SUMF at ¶ 201].

Plaintiff also sought an evolving list of accommodations with regards to transportation across Defendant's property, in order to minimize the exertion required to reach her workstation each day. To start, Plaintiff requested an access pass through an administrative building so that she would no longer have to walk around it. [SUMF at ¶ 158; Pl.'s Resp. to SUMF at ¶ 158]. Plaintiff alleges that she requested a pass to access the building from her supervisor, Mr. Low, but that he failed to provide it. [SUMF at ¶ 160]. After writing to Defendant's president, Plaintiff received the pass. [SUMF at ¶¶ 160, 162-63].

From the administration building, Plaintiff was then to take a shuttle to her workstation. [SUMF at ¶ 164]. There is some dispute among the parties as to the effectiveness of this accommodation. Plaintiff alleges this arrangement resulted in long periods of waiting in the hot sun, and that on one such occasion she passed out. [SUMF at ¶ 166]. While Defendant asserts that no one told Plaintiff to wait outside, Plaintiff contends that waiting inside the administration building was infeasible as her reduced mobility made reaching the shuttle difficult, and missing the shuttle invariably led to a late arrival on shift. [SUMF at ¶¶ 170-71; Pl.'s Resp. to SUMF at ¶¶ 170-71].

3

On April 4, 2005, Plaintiff raised concerns about her daily wait for the shuttle and proposed that she be permitted to drive her own personal vehicle into the refinery. [SUMF at ¶¶ 172, 174]. Defendant denied her request, as only certain individuals were permitted at that time to drive personal or company vehicles onto the property.[2] [SUMF at ¶¶ 175, 176-77]. Instead, Defendant arranged for a taxi driver to transport Plaintiff. [SUMF at ¶ 178]. While this appears to have worked for a while, at some point the taxi driver refused to drive Plaintiff after an incident with Plaintiff's son.[3] [SUMF at ¶¶ 178, 183-84].

Finally, Defendant arranged for co-workers to drive Plaintiff across company property. [SUMF at ¶ 185]. Plaintiff continues to dispute the convenience and efficacy of this alternative, arguing that co-workers disliked driving her due to possible liability issues and the associated inconvenience. [Pl.'s Resp. to SUMF at ¶¶ 186-87].

II. Applications for Promotion

On July 27, 2006, Defendant posted an opening for the newly-created position of Supervisor, Oil Movements and Documentation Terminal Department ("Document Supervisor"), to oversee the OMCs and Terminal Dispatchers. [SUMF at ¶¶ 76, 77]. Plaintiff applied for the position after encouragement from her then-supervisor, Chuck Amalu.[4] [SUMF at ¶¶ 78, 81].

---

[2] There is a dispute between Defendant and Plaintiff over whether this was a valid restriction; Defendant cites liability concerns and setting a negative precedent for other employees if Plaintiff were permitted to drive her personal vehicle into the refinery. [SUMF at ¶ 174; Pl.'s Resp. to SUMF, Ex. 21]. Plaintiff notes that various personnel were permitted to drive onto refinery property, implying that it makes little sense that she personally was denied. [Pl.'s Resp. to SUMF at ¶ 174].

[3] Plaintiff asserts that her son became enraged and hit the window of the taxi after the taxi driver made her enter from the rear of the vehicle, forcing Plaintiff to lift her leg higher than it could go given her physical state. [Pl.'s Resp. to SUMF at ¶ 183].

[4] There is some dispute between Defendant and Plaintiff over whether or not Mr. Amalu encouraged all of the OMCs to apply, or simply encouraged Plaintiff to apply. [*Compare* SUMF at ¶ 78 and Doc. No. 342, Amalu Dep. 128:18-25, 129:1, with Pl.'s Resp. to SUMF at ¶ 78]. Plaintiff alleges Mr. Amalu used phrases like "When you become supervisor," thereby implying that he did not encourage all of the OMCs to apply. [Pl.'s Resp. to SUMF at ¶¶ 78-79].

4

The interviews were conducted by a panel composed of Mr. Amalu, Mike Hailwood, and Robert Williams. [SUMF at ¶ 84]. Each interviewer received a packet that included a copy of Defendant's Equal Opportunity Guidelines. [SUMF at ¶ 85]. As part of the interview process, the interviewers separately scored each of the interviewees and met to discuss their rankings. [SUMF at ¶ 88]. At least one of the interviewers considered the candidates' disciplinary histories and determined that interviewee Rollin Allahar, a male of Indian descent with fewer years at the company than Plaintiff and a somewhat contentious history,[5] [SUMF at ¶¶ 92-93, 98], had fewer reported disciplinary incidents than the other candidates, including Plaintiff, [SUMF at ¶ 104; Pl.'s Resp. to SUMF at ¶ 104]. It is unclear from the record whether Mr. Allahar's comparatively short time at the company (between 5 and 6 years as compared with Plaintiff's 18) was factored into this analysis. Indeed, Plaintiff disputes that this is a legitimate comparison, alleging that Mr. Allahar's fewer years at the company would likely mean he had fewer mistakes in his history. [Pl.'s Resp. to SUMF at ¶ 104].

It is undisputed that the interviewers ranked Mr. Allahar and another applicant, Raphael Garcia, ahead of Plaintiff. [SUMF at ¶¶ 90-91]. It is also undisputed that after discussing their rankings, the interviewers collectively decided to award the position to Mr. Allahar, which decision they announced on October 2, 2006. [SUMF at ¶¶ 92-93, 98]. Defendant attributes Mr. Allahar's selection to his good work ethic, strong performance as an OMC, and excellent interpersonal skills.[6] [SUMF at ¶ 98]. The interviewers took special note of a plan he presented during his interview in which he outlined departmental changes he would make if he were

---

[5] In 2008, Mr. Allahar was found not-guilty for the alleged 2005 rape of an acquaintance in her home. [Doc. No. 420, Ex. 1]. At the time of the interview for the Document Supervisor position, Mr. Allahar still had not been acquitted of the charges, and, according to Plaintiff, had to follow certain restrictions concerning contact with an eyewitness who was also an employee of Defendant. [Pl.'s Resp. to SUMF at ¶ 104].

[6] For example, one of the interviewers testified that Mr. Allahar was known "to be a really hard worker, very personable guy." [Doc. No. 347, Hailwood Dep. at 88:11-13, 17-18].

awarded the Document Supervisor position. In particular, he presented a proposal to cross-train employees as both OMCs and Terminal Dispatchers in order to improve shift coverage. [SUMF at ¶ 100].

Plaintiff's August 31, 2006 interview also received positive feedback from interviewers. [Pl.'s Resp. to SUMF, Ex. 10]. Positive comments in the interview notes described Plaintiff as a top OMC whose work record supported a dedication to her job, and stated that Plaintiff was "constantly suggest[ing] ways to improve the performance of the OMCs." [Pl.'s Resp. to SUMF, Ex. 10]. No comments were made during the interview in relation to Plaintiff's sex or disability. [SUMF at ¶¶ 87-88]. While Plaintiff does not appear to have presented a plan comparable to that of Mr. Allahar *during* her interview, she contends that on a prior occasion, she brought forward a plan to improve the department by reducing tank contamination.[7] [Doc. No. 359, Pl.'s Dep. I at 44:4-21]. Regardless, Plaintiff was ultimately not selected for the position of Document Supervisor based upon "previous work history." [Doc. No. 363, Ex. 30].

After receiving notice of Mr. Allahar's selection, Plaintiff in October 2006 told Robert Williams she felt Defendant discriminated against her by failing to award her the promotion.[8] [SUMF at ¶ 149]. Mr. Williams alerted Richard Mahurt, Director of Human Resources, to Plaintiff's internal complaint, and Plaintiff was told her claims would be promptly investigated. [SUMF at ¶ 150].

Andy Mehalko, an employee of a third party company hired to investigate Plaintiff's claims, conducted interviews with Plaintiff, Mr. Hailwood, Mr. Amalu and Mr. Williams. [SUMF at ¶¶ 151-52]. At one point in his notes from an interview he conducted with Mr.

---

[7] The Court currently finds the evidence of why Plaintiff's plan was never implemented too uncertain to reach a final conclusion as to the plan's validity.

[8] Plaintiff testified she did not believe Defendant's failure to promote her to the Document Supervisor position had anything to do with her race, but that Defendant discriminated against her based upon her sex and disability. [SUMF at ¶¶ 109-10].

Williams, Mr. Mehalko wrote under the heading "Shift/Night work?" the following: "OMC call in sick – don't like calling in female shift worker. If have choice-goes to male. Safety issue-drive on island. Woman ever come in @ night? Yes, all the time." [Pl.'s Resp. to SUMF, Ex. 11].[9] Mr. Mehalko ultimately concluded there was no evidence that Plaintiff was denied the Document Supervisor position based upon her disability. [SUMF at ¶ 153].

Plaintiff contests Mr. Mehalko's conclusion, citing a comment made by panel interviewer Mr. Hailwood during his deposition. In response to the question of whether he felt Plaintiff was physically unable to perform any of the duties and responsibilities of the Document Supervisor position, Mr. Hailwood stated: "To be honest, it did come into my mind . . . . she might have been restricted, because there's quite a bit of movement to and fro, you know, within the terminal."[10] [Pl.'s Resp. to SUMF at ¶ 89]. Plaintiff further asserts evidence of sex discrimination based upon (1) Mr. Mehalko's interview notes and (2) the fact that, traditionally, there have been very few female supervisors. [Pl.'s Resp. to SUMF at ¶ 111].

On September 29, 2006, Defendant posted an opening for the position of Superintendent, Oil Movements and Documentation Terminal Department ("Document Superintendent"). [SUMF at ¶ 115]. Plaintiff applied for the position but did not receive an interview. [SUMF at ¶¶ 123, 125]. Defendant selected Kyle Lee, a white male, as the new Document Superintendent. [SUMF at ¶ 131]. Mr. Lee had a 20-year career in the petroleum industry, during which time he served as corporate auditor, regional trainer, branch manager, operations coordinator, operations manager, field supervisor and inspector. [SUMF at ¶ 133].

---

[9] Defendant points out that there is no deposition testimony explaining the meaning of the interview notes, assumedly undermining their utility. [Doc. No. 420, Def.'s Reply to Pl's Resp. to SUMF at ¶ 89].

[10] Despite this, Plaintiff testified elsewhere that she did not believe Mr. Hailwood discriminated against her. [SUMF at ¶ 113; Pl.'s Dep. I 121:14-16].

III.    <u>Initial Filing of the EEOC Charge and the Complaint in Federal Court</u>

In February 2007,[11] Plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant (1) discriminated against her on the basis of her race, national origin, sex, and disability by not selecting her for the position of Document Supervisor; and (2) denied her a series of reasonable accommodations by delaying to build a ramp into the computer room and issue her a pass to walk through the administration building, and by forcing her to sit in the sun while she waited for the shuttle to cross company property. [SUMF at ¶ 221].

In her charge, Plaintiff also included details of older incidents, including (1) a 1994 statement from Human Resources Supervisor Chris Laginni to the effect that she would have to go on Long-Term Disability after her involvement in a car accident, as there was no work for Plaintiff at the refinery; and (2) her efforts in the early 2000s to fill in for, or "act up" as, her Supervisor Chuck Amalu during his absences from work. [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 6-10].[12]

---

[11] The Court notes that in the materials submitted by both parties for summary judgment, the filing date for Plaintiff's EEOC charge is listed as June 2007. [SUMF at ¶ 221; Pl.'s Opp. To. Sum. Judgmt. at 16]. In previous submissions, the parties had referred to the date of filing as February 9, 2007. [*See, e.g.*, Doc. No. 87, Def.'s Opp. To Pl.'s Motion to Amd. the First Amd. Compl. at 2; Doc. No. 91, Pl.'s Reply to Def.'s Opp. at 3]. Upon close scrutiny of the documents, the Court concludes that the initial date proffered by the parties, February 9, is likely correct. The June 25, 2007 timestamp upon which the parties apparently rely for the establishment of the June 2007 date appears not on the face of the EEOC complaint, but upon Defendant's *notice* from the EEOC that Plaintiff had filed a charge. [Doc. No. 371, Aff. Willie-Paul, Ex. A]. The only date that appears on the actual EEOC charge as provided to the Court is February 9, 2007. [*Id.*]. Thus, for the purposes of this analysis, the Court will rely upon the earlier date.

[12] Additionally, Plaintiff includes in her EEOC charge details of being called in twice to work nights during Christmas holidays to fill in for Dwight Hoffman (a white male) so that he could stay home with his family, and for Bob Crosby when he had fish poisoning. [Doc. No. 371, Aff. Willie-Paul, Ex. A].

As concerns Chris Laginni's statement, Plaintiff explains in her narrative that after some confusion and further communications with Defendant, she was permitted to return to work after Mr. Laginni received more information regarding her work history. [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶ 6]. As concerns "acting up" in place of her supervisor, Plaintiff describes how during a certain period, employees of her same level and position were selected to fill in for Mr. Amalu during his absences. [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10]. Plaintiff, however, was not.[13] [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10]. Upon inquiring as to why she was never chosen to act up, Mr. Amalu and Ralph Lodrizgesa (Mr. Amalu's manager) allegedly informed her that she was not selected because of her disability and because she would have to work nights.[14] [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10]. After reporting the problem to Human Resources, however, Plaintiff was subsequently allowed to act up. [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶ 10].

On May 7, 2007, Plaintiff filed a lawsuit in federal court alleging: (1) violation of Title VII; (2) violation of VICRA; (3) wrongful discharge; (4) intentional and negligent infliction of emotional distress; (5) violation of good faith and fair dealing; and (6) punitive damages. [Doc. Nos. 1, 11-1, First Amd. Compl. (markup)]. The enumerated counts were based upon substantially the same facts as those recounted in Plaintiff's EEOC charge. Plaintiff failed to make a specific reference to the ADA, but she included language to the effect that she had "been discriminated against as a result of her disability, sex, and race in her job assignments,

---

[13] In her EEOC charge, Plaintiff names Raphael Garcia as one of those chosen. [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶¶ 7-10; *see also*, Garcia Resume, Doc. No. 362, Ex. 5G]. Mr. Amalu also remembers choosing Mr. Allahar as one of his first temporary replacements. [Doc. No. 342, Amalu Dep. at 75:7-8].

[14] Plaintiff had allegedly requested not to work nights if possible, even though she did sometimes work nights as part of her regular position. [Doc. No. 342, Amalu Dep. at 78:18-24, 79:1].

9

promotions, pay, benefits, evaluations, and treatment." [Doc. No. 11-1, First Amd. Compl. (markup), at ¶ 46].

On August 29, 2008, the EEOC issued a finding of no probable cause and advised Plaintiff of her right to sue. [SUMF at ¶ 222]. This Dismissal and Notice of Rights required Plaintiff to file a Title VII, ADA and/or Age Discrimination lawsuit based on the facts alleged in her initial charge within 90 days, or lose the right to sue under those statutes. [Doc. No. 371, Aff. Willie-Paul, Ex. A, ¶ 10].

IV. <u>Events Following the Filing of the Complaint and the EEOC Charge</u>

    a. <u>General Accommodations/Efforts</u>

Defendant notes that, among other accommodations provided to Plaintiff in mid-2007, it provided Plaintiff with a scooter in or around July 2007 after a fall in the computer room. [SUMF at ¶¶ 188-89]. Moreover, since it was difficult to navigate the scooter through the lunchroom, Defendant provided Plaintiff with a microwave and refrigerator in the computer room at her request. [SUMF at ¶¶ 192-93].

    b. <u>Installation of an Automatic Bathroom Door</u>

On July 25, 2007, Plaintiff spoke to management about putting an automatic door on the first floor bathroom in the terminal building. [SUMF at ¶ 195]. Defendant had already remodeled the first floor bathroom to make it handicap accessible.[15] Plaintiff offers to the Court an email in which Mr. Amalu refers to Plaintiff's request as "an ADA issue" that preferably would be "handled as an emergency." [Pl.'s Resp. to SUMF, Ex. 22]. For nine months, until Plaintiff's placement on administrative leave in mid-2008, Defendant failed to install an

---

[15] Defendant asserts the first floor bathroom was remodeled at Plaintiff's request and as an accommodation to Plaintiff. [SUMF at ¶ 194]. Plaintiff, on the other hand, points to testimony by Mr. Amalu, [Doc. No. 342, Amalu Dep., 121-24], indicating that Defendant remodeled the bathroom in response to the safety department's determination that it was not ADA compliant.

10

automatic door. [SUMF at ¶¶ 195, 198-99]. The door was installed nearly two years later, in July 2009, upon Plaintiff's return. [SUMF at ¶ 199].

### c. Honeywell Software System

In October 2007, Plaintiff expressed to Human Resources that she was having difficulty using the navigation ball on the Honeywell software system, a new, soon-to-be implemented computer system. [SUMF at ¶ 205]. Plaintiff requested that a mouse be installed, but the Engineering Applications Department declined, citing an inability to install a USB port in the system. [SUMF at ¶¶ 206-07]. Plaintiff admits that the Engineering Applications Department eventually resolved the issue another way, and, at any rate, the system was ultimately never implemented. [SUMF at ¶ 208].

As an additional matter, training for the Honeywell system involved sending certain employees to Canada for training. [SUMF at ¶ 114]. Plaintiff suspects she was not selected for the trip based upon her disability. [Pl.'s Resp. to SUMF at ¶ 114]. Although no one specifically said anything to Plaintiff to confirm that theory, Plaintiff asserts that she was an otherwise logical choice for the trip given her additional years of experience over the OMC selected to attend (Mr. Allahar), and her previous experience training other OMCs in the terminal. [Doc. No. 360, Pl.'s Dep. II. 108-110].

### d. The May 28, 2008 Incident and Subsequent Administrative Leave

On May 28, 2008, Plaintiff fainted and/or lost consciousness, ultimately leading to her placement on administrative leave until July 2009. [*See generally*, SUMF at ¶¶ 224, *et seq.*]. On the day of the incident (hereinafter, the "May 28 Incident"), Plaintiff was scheduled to work the 4:00 PM to 12:00 AM shift. [SUMF at ¶ 224]. Plaintiff testified she felt sick prior to reporting to work (her legs were tired and she felt hot) and that she was stressed from family-related

issues. [SUMF at ¶¶ 225-26; Pl.'s Resp. to SUMF at ¶¶ 225-26]. When Plaintiff arrived at work, she told her supervisor, Mr. Allahar, she was not feeling well. [SUMF at ¶ 229]. At that point Mr. Allahar gave her the opportunity to go home or to stay in the computer room while another OMC took over her duties. [SUMF at ¶¶ 229-30]. Plaintiff declined both offers, insisting she felt better and wanted to work. [SUMF at ¶¶ 229-30]. Mr. Allahar monitored Plaintiff's performance and, after observing Plaintiff make several judgment calls without any errors, allowed Plaintiff to continue monitoring the control board. [SUMF at ¶ 231].

At some point during Plaintiff's shift, she lost consciousness and/or fainted. [SUMF at ¶ 235; Pl.'s Resp. to SUMF at ¶ 235]. While Plaintiff was unconscious, one of the tanks filled to above the High-High set point, setting off the corresponding warning alarm indicating the tank would overflow absent immediate action. [SUMF at ¶ 236]. Plaintiff did not hear the Hard High-High alarm going off until roused by Terminal Dispatcher Billy Kalloo, who came to investigate after hearing the alarm. [SUMF at ¶¶ 237-40]. Plaintiff then contacted Terminal Operator Thomas Hutchinson, with whom she had communicated for the 20- and 10- minute warnings, and advised him to switch tanks immediately. [SUMF at ¶¶ 241, 244]. Defendant's subsequent investigation determined the tank nearly overflowed due to Plaintiff's unresponsiveness, [SUMF at ¶¶ 246, 248], a conclusion Plaintiff disputes insofar as other employees may have contributed to the delay in switching the tanks and failed to step in promptly when action was needed, [Pl.'s Resp. to SUMF at ¶¶ 243, 248].

Following the May 28 Incident, Plaintiff was placed on paid administrative leave and her return was made conditional upon her doctor's clearance that she could perform her duties as an OMC. [SUMF at ¶ 254]. Plaintiff subsequently secured a letter from her long-time treating physician that she could return to work on June 23, 2008. [SUMF at ¶¶ 257-61]. Defendant,

however, sent a letter on September 16, 2008 to Plaintiff's attorney requesting a more comprehensive opinion from Plaintiff's physician, as the physician's letter failed to clarify whether he had knowledge of Plaintiff's duties as an OMC or was familiar with the details of the May 28 Incident. [SUMF at ¶¶ 258-67].

In response, Plaintiff's attorney sent a reply letter prohibiting Defendant from directly contacting Plaintiff's physician. [SUMF at ¶ 268]. The letter also requested documentation describing the essential functions of the OMC position, and advised that Plaintiff intended to obtain an opinion from a neurologist, Dr. Weisher, [SUMF at ¶ 268], which she did later that same month, [SUMF at ¶ 272].

Defendant, by way of response on September 25, 2008, specified that it did not want an opinion from Dr. Weisher, but wanted an opinion from Plaintiff's initial treating physician. [SUMF at ¶ 269]. Defendant subsequently rejected as inadequate an October 2, 2008 written statement from Dr. Weisher, in which Dr. Weisher indicated that there was no apparent reason for Plaintiff's loss of consciousness and/or fainting spell, but that an electroencephalogram (EEG) could be conducted to definitively rule out epilepsy. [SUMF at ¶¶ 277-81]. Again, Defendant requested more proof that Dr. Weisher knew the duties and risks associated with Plaintiff's position and understood the events of May 28. [SUMF at ¶¶ 279-88].

For the next few months, Plaintiff and Defendant exchanged various communications over what doctor should answer what questions, under what time frame, and what information should be and was provided to which doctor and by whom. [SUMF at ¶¶ 278-349]. Defendant provided a letter for Plaintiff to give to her treating physician with attachments containing an extremely detailed questionnaire and work practices summary. [SUMF at ¶¶ 285-86]. There is some dispute over whether the key work practices summary was overly inclusive with respect to

the demands and requirements of the OMC position, [SUMF at ¶ 292; Pl.'s Resp. to SUMF at ¶ 292], as well as some confusion and dispute over whether the letter and attachments were even delivered to her treating physician, [SUMF at ¶¶ 293-95; Pl.'s Resp. to SUMF at ¶¶ 293-96]. Plaintiff requested to return to work in November, but Defendant refused to allow such return without the treating physician's attention to Defendant's questionnaire. [SUMF at ¶¶ 300-01].

Plaintiff's treating physician ultimately refused to communicate further with the parties regarding Defendant's remaining concerns, [*id.* at ¶¶ 296-304], despite previous assurances that he would do so, [SUMF at ¶¶ 297-98]. As a result, Defendant in January 2008 requested that Dr. Weisher respond to its fitness for duty questionnaire by the end of the month. [SUMR at ¶ 311]. When there was no response from Dr. Weisher, Defendant extended the deadline to February 18, 2009 and offered to pay any associated fee with the evaluation. [SUMF at ¶¶ 313-14, 319]. Resolution of the matter was further delayed, however, when Defendant received notice that Plaintiff's attorney would not deliver the questionnaire to Dr. Weisher until completion of a March 16 trial. [SUMF at ¶ 321].

After further communications between the parties over the course of April and May 2009, Dr. Weisher provided documentation on Plaintiff's condition satisfactory to Defendant, [SUMF at ¶¶ 339-48], and Defendant paid for Plaintiff to undergo an EEG. [SUMF at ¶¶ 305-51]. Plaintiff notified Defendant on June 22, 2009 that her EEG results were normal, and Defendant approved a July return date for Plaintiff the next day. [SUMF at ¶¶ 351, 353, 357-58].

For the majority of the period that Plaintiff was on leave, she received full pay and benefits. [SUMF at ¶ 323]. However, on March 23, 2009 Defendant notified Plaintiff that it was changing Plaintiff's leave status from paid to unpaid due to her continued delay in providing the medical information required for her return to work. [SUMF at ¶ 324]. Unfortunately, due to an

inadvertent clerical error, Plaintiff continued to receive pay for several weeks. [SUMF at ¶¶ 328-29]. There then followed some confusion in recouping the pay from Plaintiff's checking account, as Plaintiff's account held insufficient funds for such recoupment, and Defendant's attempts to do so allegedly resulted in a penalty fee for Plaintiff. [SUMF at ¶¶ 330-32]. After her reinstatement, Defendant changed Plaintiff's status from unpaid to paid and retroactively converted the portion of her leave that was unpaid to paid. [SUMF at ¶ 354].

    e. The September 3, 2010 Incident and Plaintiff's Placement on CAPs

At some point after her return to work, Plaintiff was placed on new medication that both failed to alleviate certain symptoms of her Multiple Sclerosis and induced depression. [SUMF at ¶ 372]. Despite this depression, Plaintiff felt she could be sufficiently attentive, responsive, and focused to perform the duties of an OMC. [SUMF at ¶ 373].

On September 3, 2010, Plaintiff was scheduled to work the 8:00 PM to 8:00 AM shift. [SUMF at ¶ 375]. Plaintiff's stomach was not feeling well, she was depressed as a result of her new medication, and she was upset because of events following the recent arrest of her son. [SUMF at ¶ 377; Pl.'s Resp. to SUMF at ¶ 377]. Plaintiff cited Defendant's limited personnel resources as a reason for not calling in sick. [Pl.'s Resp. to SUMF at ¶ 378].

At around 12:30 AM it became apparent, either through observation or through Plaintiff's own comments, that Plaintiff was not feeling well. [SUMF at ¶¶ 380-96]. She allegedly told Terminal Shift Superintendent Reginald Sam that she wanted to go home, and eventually, someone arrived to relieve her of her shift. [SUMF at ¶ 374; Pl.'s Resp. to SUMF at ¶¶ 374].

It was discovered that there were at least some missed stops and a product imbalance that took place during the time Plaintiff was on shift that night. [SUMF at ¶¶ 397-404]. After an investigation, during which Plaintiff gave her version of events, [Doc. No. 360, Pl.'s Dep. II, Ex.

61], Defendant concluded Plaintiff had failed to notify supervision that she was not feeling well, and had committed a series of errors, [SUMF at ¶¶ 403-04].[16]

As a result of the "September 3 Incident", Plaintiff was placed on Defendant's Corrective Action Plan ("CAPs") on October 15, 2010. [SUMF at ¶¶ 68, 412]. Defendant had allegedly reviewed the disciplinary records of OMC Emilinda Pierre, who had also been placed on CAPs previously, to gauge consistency of treatment. [Doc. No. 358, Willie-Paul Dep. II, 107:1-25]. Plaintiff was advised that her performance would be "monitored frequently to verify accuracy of Transfer Tasks, Alarm Conditions, Transfer Sheets, Routing Reports and other required work products." [SUMF at ¶ 414]. In addition, Plaintiff was warned that "[f]ailure to make significant progress at any time during this period . . . may result in further disciplinary action up to and including termination." [SUMF at ¶ 414].

The September 3 Incident was not the first time Plaintiff had been disciplined or placed on CAPs. Her most recent disciplinary history, as provided by Defendant, began on October 26, 1998, when Plaintiff was issued a written warning for missing a stop. [SUMF at ¶ 214]. On December 7, 2001, Plaintiff received a five-day suspension in relation to a November 30, 2001 tank overflow. [Doc. No. 360, Pl.'s Dep. II, Ex. 61]. On November 18, 2002, Plaintiff was issued a written warning for poor performance/inattentiveness to duty relating to her failure to detect that a tank was receiving ballast water for four hours with no level change, which could have resulted in a tank overflow. [SUMF at ¶ 216]. On April 30, 2004, Plaintiff failed to observe the movement of a tank in a timely manner, resulting in a missed stop. [SUMF at ¶ 217].

---

[16] There is some disagreement between Defendant and Plaintiff over the level of Plaintiff's culpability in comparison with others who played a role in the mistakes, both before and after Plaintiff's shift, and if the discipline imposed on the other employees was adequate or comparable to Plaintiff's. [See Pl.'s Resp. to SUMF at ¶ 405; Def.'s Reply to Pl.'s Resp. to SUMF at ¶ 405].

On February 11, 2005, Plaintiff was issued a verbal warning for inaccurately opening a gauge. [SUMF at ¶ 218]. On June 19, 2005, Plaintiff was issued a written warning and a five-day suspension for missing a stop, which resulted in the Hard High level alarm going off. [SUMF at ¶ 219]. On February 9, 2006, Plaintiff allegedly missed a stop, causing the High-High alarm to go off, but does not recall if she was disciplined as a result of this mistake. [SUMF at ¶ 220].

On November 17, 2009, Plaintiff failed to monitor a stop and received a warning in her 2009 performance review. [SUMF at ¶ 367]. On March 2, 2010, a tank overfilled and the high level hardware alarm went off. [SUMF at ¶ 369]. Plaintiff received verbal counseling with respect to her role in the incident but was not formally disciplined. [SUMF at ¶ 370-71].

 f. <u>The October 18, 2010 Incident and Plaintiff's Termination</u>

On October 18, 2010, just three days after being notified that she had been placed on CAPs, Plaintiff was involved in another incident, (the "October 18 Incident"), in which she was ill during her scheduled 12-hour shift. [SUMF at ¶¶ 437-63]. The illness this time, however, was different from the previous September episode in that Plaintiff alleges she threw up multiple times. [SUMF at ¶ 440; Pl.'s Resp. to SUMF at ¶ 440]. Plaintiff further alleges that because she felt chastised for leaving work early and being placed on CAPs after the September 3 Incident, she did not feel she should tell anyone that she was feeling unwell. [Pl.'s Resp. to SUMF at ¶¶ 38, 432].

During her shift, several mistakes were made, and Plaintiff was unable to pass on her shift to the next OMC with all of the necessary paperwork complete. [SUMF at ¶¶ 450-57]. Plaintiff asserts at least some of the mistakes attributed to her that night were the result of her

illness and vomiting. [Pl.'s Resp. to SUMF at ¶ 447]. Plaintiff was suspended after her shift pending an investigation into the events of that night. [SUMF at ¶ 464].

Defendant concluded from its investigation that Plaintiff made a number of serious errors during her shift in violation of Defendant's company procedures and guidelines, [SUMF at ¶ 472], and which, according to Defendant, could have resulted in a catastrophic explosion, [SUMF at 478]. Defendant further concluded that when Plaintiff became ill during her shift, she had the responsibility to promptly inform management that she was unfit to work, in order to avoid any potential incidents. [SUMF at ¶ 437]. As a result of its conclusions, Defendant terminated Plaintiff's employment effective November 17, 2010, ostensibly based upon Plaintiff's previous placement on CAPs and the severity of Plaintiff's error. [SUMF at ¶ 480].

V. Relevant Procedural History Since Termination

After an uncontested April 2008 first amendment to the Complaint in which Plaintiff added details surrounding the Document Superintendent position, the Court granted Plaintiff's motion to amend the Complaint a second time over Defendant's objections. [Doc. No. 97]. In her second amendment, Plaintiff sought to add additional factual allegations related to disability discrimination (including Defendant's allegedly unlawful request for a fitness for duty evaluation following the May 28 Incident) and an additional request for relief under the ADA. [Doc. No. 81].

In its opposition papers, Defendant argued that Plaintiff had lost the right to file an ADA claim when the 90-day period following the issuance of the EEOC's right to sue notice lapsed, and that such amendment would be futile and prejudicial insofar as the scope of discovery would be greatly expanded. [Doc. No. 87]. Moreover, the new factual allegations were distinct from and temporally unrelated to the facts pled in the initial Complaint and the EEOC charge. [*Id.*].

18

Since Plaintiff failed to file additional charges with the EEOC within 300 days of the new allegations, Defendant argued that Plaintiff had failed to exhaust her remedies with respect to those claims and was therefore barred from adding them to her Complaint. [*Id.*].

The Court rejected Defendant's arguments, finding that, "Plaintiff's [initial] Complaint gave Defendant notice of allegations [of] disability discrimination," [Doc. No. 97 at 2, 6], even without specific reference to the ADA, and thus that "the proposed amendments . . . [neither] surprise[d] nor substantially prejudice[d] Defendant," [*id.* at 8]. The Court then denied Defendant's motion for reconsideration, [Doc. No. 110]. Plaintiff has since filed a Third Amended Complaint that was unopposed by Defendant. [Doc. No. 128]. After extensive fact discovery, Defendant has now moved for summary judgment on all claims. [Doc. Nos. 373-74]. Plaintiff opposes. [Doc. Nos. 408-09].

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In reaching this determination, the Court must construe all facts and inferences in the light most favorable to the nonmoving party, *Boyle v. Cty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998), which party must come forward with specific facts showing a genuine issue for trial, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "A factual dispute is 'genuine' and thus warrants trial 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49, 252 (1986)).

19

MOTION FOR SUMMARY JUDGMENT

DISCUSSION

In its motion for summary judgment, Defendant argues for dismissal of Plaintiff's claims based upon (1) expiration of the statute of limitations and/or failure to exhaust administrative remedies and (2) failure to sufficiently establish the remaining claims. The Court will first discuss those claims Defendant argues should be dismissed based upon a lapse of the applicable statute of limitations and the failure to exhaust administrative remedies. The Court will then review any remaining claims.

I. Expiration of the Statute of Limitations and/or Failure to Exhaust Administrative Remedies

Defendant's arguments concerning expiration of the applicable statute of limitations and the failure to exhaust administrative remedies can be broken down into various categories. With regards to Plaintiff's ADA and Title VII claims, Defendant argues that based upon the content and timing of Plaintiff's EEOC charge, certain claims should be dismissed because they (1) relate to incidents that occurred more than 300 days prior to the filing of the charge; (2) were not brought by Plaintiff in a lawsuit within 90 days after the issuance of the right to sue notice; or (3) were never even alleged in the charge. With regards to Plaintiff's VICRA claims, Defendant alleges that certain claims must be dismissed as untimely under VICRA's two-year statute of limitations. The Court will consider each of these arguments in turn.

a. Untimely ADA and Title VII Claims

In order to bring an ADA or a Title VII claim, a plaintiff must file a charge of discrimination with the EEOC within 300 days of an alleged incident. *See* 42 U.S.C. § 2000e-5(e)(1); *Commc'ns Workers of America v. New Jersey Dept. of Personnel*, 282 F.3d 213, 216 (3d Cir. 2002); *Nielsen-Allen v. Indus. Maint. Corp.*, 285 F. Supp. 2d 671 (D.V.I. 2002). If after 180